No. 26-60057

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ASSIST WIRELESS, L.L.C.; BOOMERANG WIRELESS, L.L.C.,
D/B/A ENTOUCH WIRELESS; EASY TELEPHONE SERVICES COMPANY,
D/B/A EASY WIRELESS; and I-WIRELESS, L.L.C., D/B/A ACCESS WIRELESS,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION;
and the UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review from the
Federal Communications Commission

**OPENING BRIEF OF PETITIONERS ASSIST WIRELESS, L.L.C.,
BOOMERANG WIRELESS, L.L.C., D/B/A EASY TELEPHONE
SERVICES COMPANY, D/B/A EASY WIRELESS, AND
I-WIRELESS, L.L.C. D/B/A ACCESS WIRELESS**

Miles E. Coleman, Esq.
Abigail Wood McCoy, Esq.
Nelson Mullins Riley & Scarborough, LLP
2 W. Washington Street, Ste 400
Greenville, SC 29601
(864) 373-2245
miles.coleman@nelsonmullins.com
abigail.mccoy@nelsonmullins.com

*Counsel for Petitioners*

## CERTIFICATE OF INTERESTED PERSONS

No. 26-60057, *Assist Wireless, L.L.C., et al. v. Federal Communications Commission*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Petitioners: | Counsel for Petitioners: |
|---|---|
| Assist Wireless, L.L.C. | Miles Coleman and Abigail McCoy, both of Nelson Mullins Riley & Scarborough, L.L.P., Greenville, SC |
| Boomerang Wireless, L.L.C. | |
| Easy Telephone Services Company | |
| i-wireless, L.L.C. | |

Pursuant to Rule 26.1(a), Fed. R. App. P., counsel certifies that the preceding parties are neither publicly-held corporations nor owned in whole or in part by publicly-held corporations with the exception of i-wireless LLC d/b/a Access Wireless, which is 50% owned by a publicly-held corporation, Kroger Co.

i

| Respondents: | Counsel for Respondents: |
| --- | --- |
| Federal Communications Commission | Jacob Lewis of Federal Communications Commission Washington, DC |
| | P. Ellison of Federal Communications Commission Washington, DC |
| | Sarah Citrin of Federal Communications Commission Washington, DC |
| | William Scher of Federal Communications Commission Washington, DC |
| | Igor Helman of Federal Communications Commission Washington, DC |
| | Todd Blanche, Acting U.S. Attorney General, U.S. Department of Justice Washington, DC |
| | Robert Nicholson of U.S. Department of Justice Washington, DC |
| United States of America | Jacob Lewis of Federal Communications Commission Washington, DC |
| | P. Ellison of Federal Communications Commission Washington, DC |
| | Sarah Citrin of Federal Communications Commission Washington, DC |
| | William Scher of Federal Communications Commission Washington, DC |
| | Igor Helman of Federal Communications Commission Washington, DC |
| | Todd Blanche, Acting U.S. Attorney General, U.S. Department of Justice Washington, DC |
| | Robert Nicholson of U.S. Department of Justice Washington, DC |

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|
| BBBY, Ltd. | These entities and individuals are not parties to this proceeding and are not represented by counsel in relation to this proceeding. |
| Flagship Equity LLC | |
| Genie Global | |
| HH Ventures, LLC | |
| Joseph Fernandez | |
| Jose Cortes, Jr. | |
| Kroger Co. | |
| SXCS Investments, LLC | |
| ViaOne Acquisition Company, LLC | |
| ViaOne Services, LLC | |

Counsel certifies that the parties listed above are not publicly-held corporations, with the exception of Kroger Co., which is a publicly-held corporation.

Dated: May 13, 2026

s/ Miles E. Coleman
Miles E. Coleman
Attorney of Record for Petitioners

**STATEMENT REGARDING ORAL ARGUMENT**

Petitioners Assist Wireless, LLC, Boomerang Wireless, LLC d/b/a enTouch Wireless, Easy Telephone Services Company d/b/a Easy Wireless, and i-wireless LLC d/b/a Access Wireless respectfully request oral argument. *See* Fifth Circuit Rule 28.2.3. This case involves important issues of administrative law and the construction of agency orders. Oral argument would substantially aid the Court in its resolution of the case. *See* Fed. R. App. P. 34(a)(2).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................... iv

TABLE OF CONTENTS .......................................................................... v

TABLE OF AUTHORITIES ...................................................................... vii

JURISDICTIONAL STATEMENT ............................................................... xii

STATEMENT OF THE ISSUES ................................................................ xiii

INTRODUCTION ................................................................................. 1

STATEMENT OF THE CASE .................................................................... 2

    A.    The Lifeline program ................................................ 2

    B.    The FCC's COVID-19 Waiver Orders ................................... 8

    C.    The FCC's Seventh COVID-19 Waiver Order ...................... 11

    D.    Petitioners' revision to their April 2021 reimbursement claims and the agency's response. ....................................... 12

SUMMARY OF THE ARGUMENT ............................................................. 17

STANDARD OF REVIEW ...................................................................... 21

ARGUMENT .................................................................................... 22

I.  The text of the Seventh COVID-19 Waiver Order mandates that Petitioners are entitled to reimbursement for April 2021 non-users. ..................................................................... 22

    A.    The plain language of the Seventh COVID-19 Waiver Order establishes that the non-usage rule remained waived on May 1, 2021. .......................................... 23

    B.    The plain language of the Seventh COVID-19 Waiver Order establishes that the cure notices were to be sent no sooner than May 1, 2021. .............................................. 27

C.   Canons of textual interpretation and construction support Petitioners' plain-language interpretation. ............32

D.   The FCC's interpretation is arbitrary and capricious because it is contrary to the plain language and ordinary meaning of the Order. ..........................................36

E.   Petitioners' interpretation harmonizes all relevant sections of the Seventh COVID-19 Waiver Order. ...............38

II.  The Court should not defer to the FCC's interpretation of the Seventh COVID-19 Waiver Order. ..............................40

A.   The Seventh COVID-19 Waiver Order is not genuinely ambiguous. ............................................................41

B.   Even if the Court were to find the Order ambiguous, deference is not warranted. .............................................43

1.   The FCC's interpretation of the Seventh COVID-19 Waiver Order is not reasonable. ............................45

2.   The Seventh COVID-19 Waiver Order does not implicate the FCC's substantive expertise. .................45

3.   The FCC's interpretation of the Seventh COVID-19 Waiver Order is nothing more than a post hoc rationalization or convenient litigating position. ........46

III. The FCC violated the requirement that it act in the public interest when it denied reimbursement for discounted service provided to Lifeline subscribers who did not use their services during April 2021, despite the usage requirement being waived during that month. ........................................47

CONCLUSION ....................................................................51

CERTIFICATE OF SERVICE ...................................................52

CERTIFICATE OF COMPLIANCE ..............................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T, Inc. v. Fed. Commc'ns Comm'n,*
886 F.3d 1236 (D.C. Cir. 2018) ........................................................ 48

*Auer v. Robbins,*
519 U.S. 452 (1997) ............................................ 41, 42, 43, 45

*BedRoc Ltd., LLC v. United States,*
541 U.S. 176 (2004) ........................................................ 22

*Cash v. Conn. Appliances, Inc.,*
2 F. Supp. 2d 884 (E.D. Tex. 1997) ................................................ 22

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ........................................................ 44

*In re Davis,*
960 F.3d 346 (6th Cir. 2020) ................................................ 34

*Dominion Ambulance, L.L.C. v. Azar,*
968 F.3d 429 (5th Cir. 2020) ................................................ 36

*Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health &
Human Servs.,*
718 F.3d 488 (5th Cir. 2013) ................................................ 21

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.,*
867 F.3d 564 (5th Cir. 2017) ........................................... 21, 22

*Fernandez v. Seaboard Marine LTD,*
135 F.4th 939 (11th Cir. 2025) (Jordan, J. concurring) .................... 24

*Fire Protection Serv., Inc. v. Survitec Survival Prods., Inc.,*
153 F.4th 439 (5th Cir. 2025) ........................................... 25

*Green v. Brennan,*
578 U.S. 547 (2016) ........................................................ 32

*Hames v. Heckler,*
707 F.2d 162 (5th Cir. 1983)......................................................21

*In re Harvey,*
84 B.R. 197 (D. Colo. Bankr. 1988)..........................................34

*I.C.C. v. S. Ry. Co.,*
543 F.2d 534 (5th Cir.1976)......................................................31

*Kisor v. Wilkie,*
588 U.S. 558 (2019).......................................................... *passim*

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992)....................................................................31

*Motor Vehicle Mfg. Assoc. of the U.S., Inc. v. State Farm Mut.*
*Auto. Ins. Co.,* 463 U.S. 29 (1983)...................................... 36, 48

*Nat'l Auto. Dealers Ass'n v. Fed. Trade Comm'n,*
127 F.4th 549 (5th Cir. 2025) ............................................. 45, 46

*Nat'l Lifeline Ass'n v. FCC,*
921 F.3d 1102 (D.C. Cir. 2019) ............................................ 3, 47

*Neumann's Pharmacy, L.L.C. v. Drug Enf't Admin.,*
167 F.4th 320 (5th Cir. 2026) ............................................. 37, 38

*Niz-Chavez v. Garland,*
593 U.S. 155 (2021)....................................................................50

*Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.,*
374 F.3d 362 (5th Cir. 2004).....................................................21

*Russello v. United States,*
464 U.S. 16 (1983)............................................................... 35, 36

*St. Tammany Parish v. FEMA,*
556 F.3d 307 (5th Cir. 2009).....................................................31

*Tex. Clinical Labs v. Sebelius,*
612 F.3d 771 (5th Cir. 2010).....................................................21

*Tex. Democratic Party v. Benkiser,*
459 F.3d 582 (5th Cir. 2006) ................................................ 28

*Thomas v. Bryant,*
919 F.3d 298 (5th Cir. 2019) ......................................... 23, 24

*Trustees of IAM National Pension Fund v. Ohio Magnetics,*
*Inc.,* 656 F.Supp.3d 112 (D.D.C. 2023) ............................... 28

*United States v. Caniff,*
955 F.3d 1183 (11th Cir. 2020) ........................................... 24

*United States v. Mead Corp.,*
533 U.S. 218 (2001) (Scalia, J., dissenting) ....................... 44

*United States v. Wong Kim Bo,*
472 F.2d 720 (5th Cir. 1972) .............................................. 36

*Univ. of Cincinnati v. Bowen,*
875 F.2d 1207 (6th Cir. 1989) ............................................ 38

*US Air, Inc. v. Dep't of Transp.,*
969 F.2d 1256 (D.C. Cir. 1992) .......................................... 26

**Rules**

Fed. R. App. P. 11(b) ............................................................ 26

Fifth Circuit Rule 11.2 ........................................................ 26

**Statutes**

5 U.S.C. § 706(2)(A) ............................................................ 21

5 U.S.C. § 706(2)(E) ............................................................ 21

47 U.S.C. § 214 ...................................................................... 3

47 U.S.C. § 254 ...................................................................... 3

47 U.S.C. § 402(g) ............................................................... 21

**Other Authorities**

47 C.F.R. § 1.4(c) ...................................................................... 5, 12, 29, 40

47 C.F.R. § 1.13(a)(1) ............................................................................. 30

47 C.F.R. § 54.405(e)(3) ................................................................... 4, 5, 30

47 C.F.R. § 54.407 ........................................................................ 4, 6, 7, 12

47 C.F.R. § 54.701(a) ................................................................................. 7

American Heritage Dictionary,
    https://ahdictionary.com/word/search.html?q=as+of ......................... 29

Antonin Scalia & Bryan A. Garner, READING LAW: THE
    INTERPRETATION OF LEGAL TEXTS 183 (2012) ..................................... 31

*Bridging the Digital Divide for Low-Income Consumers et al.*,
    WC Docket No. 17-287 et al., Fifth Report and Order,
    Memorandum Opinion and Order on Reconsideration, and
    Further Notice of Proposed Rulemaking, 34 FCC Rcd.
    10886 (2019) ("2019 Lifeline Order") ............................. 5, 7, 29, 31, 47

Britannica Dictionary,
    https://www.britannica.com/dictionary/beyond ................................. 25

Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/learner-
    english/beyond ................................................................................. 25

Collins Dictionary,
    https://www.collinsdictionary.com/us/english-language-
    learning/beyond ............................................................................... 25

*Lifeline and Link Up Reform and Modernization*,
    30 FCC Rcd. 7818, 7898 ¶¶ 238–43 (June 18, 2015) ("2015
    Lifeline Order") ..................................................................... 6, 12, 13

*Lifeline and Link Up Reform and Modernization et al.*,
    Order, 27 FCC Rcd. 6656 ¶ 305 (2012) ............................................... 7

*Lifeline and Link Up Reform and Modernization et al.*, WC
Docket No. 11-42 et al., Report and Order and Further
Notice of Proposed Rulemaking, 27 FCC Rcd. 6656, 6788,
¶ 305 (2012) ....................................................................................... 13

*Lifeline and Link Up Reform and Modernization et al.*, WC
Docket No. 11-42 et al., Third Report and Order, Further
Report and Order, and Order on Reconsideration, 31 FCC
Rcd. 3962, 4115,¶ 415 (2016) ................................................... 5, 29, 31

*Lifeline and Link Up Reform and Modernization*,
Order, 35 FCC Rcd. 12954 (Nov. 16, 2020) ........................... 10, 33, 49

*Lifeline and Link Up Reform and Modernization*,
Order, 35 FCC Rcd. 4482 (WCB Mar. 30, 2020) ............... 9, 10, 33, 49

*Lifeline and Link Up Reform and Modernization*,
Order, 35 FCC Rcd. 5510 (WCB June 1, 2020) .......................... 10, 33

*Lifeline and Link Up Reform and Modernization*,
Order, 35 FCC Rcd. 8791 (WCB August 17, 2020) ............... 10, 11, 33

*Lifeline and Link Up Reform and Modernization*,
Order, 5 FCC Rcd. 2729 (WCB Mar. 17, 2020) ........................ 8, 9, 49

*In the Matter of Lifeline and Link Up Reform and
Modernization*, Order on Review, FCC 25-82 at ¶ 4
(Dec. 3, 2025) ("FCC's December 3 Order") .............................. *passim*

*Lifeline and Link Up Reform and Modernization*, Order on
Review, WC Docket No. 11-42 ¶ 1 & n.4 (WCB Dec. 3,
2025) ................................................................................................... 13

*Lifeline and Link Up Reform and Modernization*, Order, WC
Docket No. 11-42 (WCB Feb. 24, 2021) ..................................... *passim*

Norman J. Singer, SUTHERLAND STATUTORY CONSTRUCTION
§ 31.06 (5th ed.1993) ........................................................................ 22

Oxford English Dictionary,
https://www.oed.com/search/dictionary/?scope=Entries&q=as+of .... 29

# JURISDICTIONAL STATEMENT

This Court has jurisdiction to review final orders of the FCC and thus has jurisdiction over this petition pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1) because Petitioners are adversely affected by actions challengeable under 28 U.S.C. § 2342. Additionally, both Assist Wireless LLC and Boomerang Wireless LLC d/b/a enTouch Wireless's principal offices are in Texas, and thus venue is proper in the Fifth Circuit Court of Appeals pursuant to 28 U.S.C. § 2343.

## STATEMENT OF THE ISSUES

I.      Whether the FCC erred in its interpretation of the plain language of the Seventh COVID-19 Waiver Order.

II.      Whether the FCC's interpretation of the Seventh COVID-19 Waiver Order should be afforded deference when the Order is not ambiguous, its interpretation doesn't require specialized knowledge or expertise, and the agency's interpretation is an unfair, post hoc rationalization.

III.      Alternatively, whether the FCC violated the requirement that it act in the public interest when it denied reimbursement for Lifeline subscribers who did not use their services during April 2021, despite the usage requirement being waived during that month.

## INTRODUCTION

Over a 12-month span during the COVID-19 pandemic, the Federal Communications Commission issued a series of orders waiving certain programmatic requirements that would usually have applied to the telephone service providers participating in the FCC's Lifeline program for low-income consumers. The waived requirements normally would have compelled the providers to kick subscribers out of the program for not meeting certain usage requirements and would have prevented the providers from receiving reimbursement for those subscribers' services.

The seventh and final order, issued by the FCC in February 2021, extended these waivers one last time, but set a final limit, stating in the first paragraph, "we decline to further extend the existing waiver of the Lifeline usage requirement *beyond May 1*, 2021" (emphasis added). Lifeline service providers are reimbursed for the discounts they provided to Lifeline subscribers in April based on the May 1 "snapshot," which identifies the subscribers served by each provider as of that day. The waiver order also instructed the providers to send "notices to subscribers who, *as of May 1*, 2021, have not used their service in the previous 30-days" (emphasis added).

In reliance on the language in the seventh waiver order, Petitioners sent notices to the affected subscribers no earlier than May 1 and sought reimbursement for the subscribers who were on their rolls on May 1, even if those subscribers had not as of that date satisfied the usage requirement. The FCC, however, denied Petitioners' requests for reimbursement. In the FCC's view, what the Seventh COVID-19 Waiver Order *really* meant was that the waiver lasted only until April 30, 2021, and the companies should have sent the notices to the subscribers on April 30, 2021, too.

The FCC's decision denying Petitioners' requests is contrary to the plain language of the final waiver order and, therefore, is arbitrary and capricious. The issue before the Court is a straightforward question of textual interpretation, and the agency's views are not entitled to deference. This Court should reverse.

## STATEMENT OF THE CASE

### A. The Lifeline program

The FCC's Lifeline program offers low-income consumers discounts on telephone and internet access service. The FCC created the program by regulation in 1985 "to ensure that low-income consumers had access

to affordable, landline telephone service." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1106 (D.C. Cir. 2019). Congress codified the program in 1996. *See* 47 U.S.C. §§ 214, 254. Under the Lifeline program, qualified consumers receive discounted service from telephone service providers— known in the program as Eligible Telecommunications Carriers ("ETCs")—who, in turn, are reimbursed with a monthly federal support payment for each Lifeline subscriber they serve. *Nat'l Lifeline Ass'n*, 921 F.3d at 1106–07.

Four aspects of the Lifeline program are especially relevant to this appeal: (i) the usage requirement, (ii) cure notices, (iii) the cure period, and (iv) the monthly snapshot. All four relate to the interplay between a Lifeline subscriber's use of the Lifeline program and an ETC's receipt of the federal subsidy for the subscriber's discounted services. Although this appeal involves the ways the FCC waived or altered these aspects of the program during the COVID pandemic, those waivers and alterations are best understood against the backdrop of how the program would *normally* operate. Each is discussed in turn below.

First, the usage requirement. Lifeline subscribers who don't pay a monthly fee must use their service at least once every 30 days to maintain

their eligibility for the program. *See* 47 C.F.R. § 54.405(e)(3). That usage could include, among other things, making a call, receiving a call, using data, sending a text message, or simply affirming that the service is wanted. *Id.* § 54.407(c)(2). Failure to use the service can result in the subscriber being de-enrolled from the Lifeline program after being given notice and an opportunity to cure. *Id.* § 54.405(e)(3).

Second, the cure notices. After 30 consecutive days of non-usage by a Lifeline subscriber, the ETC is required to send the subscriber a cure notice "using clear, easily understood language" to inform the subscriber that continued non-usage will result in service termination unless the subscriber cures the non-usage. *Id.* § 54.405(e)(3). These notices are not sent en masse on a given day of the month, *i.e.*, on the first or last day of each month. Rather, the regulation requires ETCs to send a notice to a subscriber after "30 consecutive days" of non-usage. *Id.* In normal circumstances, then, the notices go out throughout the month, sent to individual non-using subscribers on the day after the subscriber has completed the 30th day of non-usage.

Third, the cure period. After the cure notice is sent, a non-using subscriber has 15 days to "cure" the non-usage and remain in the Lifeline

program by using the service. *See* 47 C.F.R. § 54.405(e)(3). The parties dispute whether that 15-day cure period begins on the day the notice is *sent* or the day *after* that. But FCC regulations regarding the computation of time indicate that when, as here, a time period is initiated by an act or event (here, the sending of the cure notice), the period of time begins the day *after* that act or event:

> **General Rule—Computation of Beginning Date When Action is Initiated by Act, Event or Default.** Commission procedures frequently require the computation of a period of time where the period begins with the occurrence of an act, event or default and terminates a specific number of days thereafter. Unless otherwise provided, the first day to be counted when a period of time begins with the occurrence of an act, event or default is *the day **after** the day on which the act*, event or default occurs.

47 C.F.R. § 1.4(c) (emphasis added); *see also Lifeline and Link Up Reform and Modernization et al.*, WC Docket No. 11-42 et al., Third Report and Order, Further Report and Order, and Order on Reconsideration, 31 FCC Rcd. 3962, 4115,¶ 415 (2016) ("2016 Lifeline Order") (noting that a Lifeline subscriber can cure his non-usage by using services "during the *subsequent* 15 days" after the cure notice is sent) (emphasis added); *Bridging the Digital Divide for Low-Income Consumers et al.*, WC Docket

No. 17-287 et al., Fifth Report and Order, Memorandum Opinion and Order on Reconsideration, and Further Notice of Proposed Rulemaking, 34 FCC Rcd. 10886, 10936, ¶ 116 (2019) ("2019 Lifeline Order") (same).

Fourth, the monthly snapshot. Federal regulations state that the subsidy amount paid to an ETC for discounted services it provided under the Lifeline program is determined "based on the number of actual qualifying low-income customers . . . that the eligible telecommunications carrier serves directly as of the first of the month." 47 C.F.R. § 54.407(a). In practice, this means an ETC takes a "snapshot" of its Lifeline subscribers on the first day of each month and then files requests for reimbursements attributable to those subscribers' services for the month prior. *Id.; see also* Lifeline and Link Up Reform and Modernization, 30 FCC Rcd. 7818, 7898 ¶¶ 238–43 (June 18, 2015) ("2015 Lifeline Order"). For example, a snapshot on May 1 of a given year would determine the number of Lifeline subscribers for which the ETC would receive reimbursement for discounted services it provided in April. *See* 2015 Lifeline Order at n.478 ("For example, on May 1, carriers would take a snapshot of the number of subscribers in their system on that day, which they would use . . . for the April data month.")

When making that snapshot calculation, ETCs can receive reimbursement only for "subscribers who have used the service within the last 30 days, or who have cured their non-usage." 47 C.F.R. § 54.407(c)(2). In other words, an ETC *can't* seek reimbursement for the prior month for a subscriber who, on the date of the snapshot, is *in* his cure period and hasn't yet cured his non-usage. *See* 2019 Lifeline Order, 34 FCC Rcd. 10886, 10937, ¶¶ 117–19.

After taking their monthly snapshots, ETCs use the Lifeline Claims System to submit their reimbursement claims, and they may revise those claims for up to one year. *See Lifeline and Link Up Reform and Modernization et al.*, Order, 27 FCC Rcd. 6656 ¶ 305 (2012) ("2012 Lifeline Order"). Those payments and other program operations are undertaken by the Universal Service Administrative Company ("USAC"), a not-for-profit company that the FCC has designated to administer the FCC's universal services programs, including Lifeline. *See* 47 C.F.R. § 54.701(a). USAC is responsible for, among other things, disbursing support payments to ETCs. *Id.* at § 54.702(b). However, USAC's role is relatively narrow: it "may not make policy, interpret unclear provisions

7

of the [applicable] statute or [the FCC's] rules, or interpret the intent of Congress." *Id.* § 54.702(c).

In sum, the Lifeline program reimburses ETCs monthly for phone and data services that the ETCs provided to low-income Lifeline subscribers in the preceding month. Under normal circumstances, an ETC's reimbursement amount is calculated based on a snapshot taken on the first day of each month to capture the number of subscribers who, as of that snapshot date, had used their services in the past 30 days or had timely cured any non-usage. ETCs are not, however, reimbursed for subscribers who, on the snapshot date, are already in their cure period but have not yet cured their non-usage.

Those normal rules changed, however, when the nation and the FCC grappled with the COVID-19 pandemic in 2020 and 2021.

## B. The FCC's COVID-19 Waiver Orders

On March 17, 2020, the Wireline Competition Bureau (the "Bureau")—the division of the FCC that regulates the Universal Service Fund, which includes the Lifeline program—released the first in a series of orders waiving certain Lifeline requirements during the COVID-19 pandemic. *See Lifeline and Link Up Reform and Modernization*, Order, 5

FCC Rcd. 2729 (WCB Mar. 17, 2020) ("First COVID-19 Waiver Order"). Noting that waiving these requirements was in the "public interest," the Bureau waived for 60 days the FCC's rules that would otherwise have required Lifeline subscribers annually to demonstrate their continued eligibility for the program. *Id.*

On March 30, 2020, in its second COVID-19 waiver order, the Bureau waived the Lifeline usage requirements to ensure that no Lifeline subscribers were involuntarily de-enrolled for non-usage and that ETCs would continue receiving reimbursement for providing discounted Lifeline services even to those subscribers not meeting the usage requirements. *Lifeline and Link Up Reform and Modernization*, Order, 35 FCC Rcd. 4482 (WCB Mar. 30, 2020) ("Second COVID-19 Waiver Order"). The Order waived "the Lifeline program's usage requirements and general de-enrollment procedures until May 29, 2020," and it "direct[ed] ETCs to restart calculating Lifeline subscribers' non-usage periods after the end of the waiver period on May 29, 2020." *Id.* at ¶¶ 2, 7. The Bureau expressly noted four times that these waivers were motivated by and consistent with the public interest. *Id.* at ¶¶ 6, 8, 12.

Over the next nine months, the Bureau issued four more COVID waiver orders, each of which extended by two or three more months the waiver of the Lifeline usage requirements and de-enrollment procedures. In each instance, the Bureau expressly stated that the waiver would conclude at the end of the *last day* of a given month. *See, e.g., Lifeline and Link Up Reform and Modernization*, Order, 35 FCC Rcd. 4482 (WCB Apr. 29, 2020) ("Third COVID-19 Waiver Order") (extending prior waivers "until June 30, 2020"); *Lifeline and Link Up Reform and Modernization*, Order, 35 FCC Rcd. 5510 (WCB June 1, 2020) ("Fourth COVID-19 Waiver Order") (extending prior waivers "through August 31, 2020"); *Lifeline and Link Up Reform and Modernization*, Order, 35 FCC Rcd. 8791 (WCB August 17, 2020) ("Fifth COVID-19 Waiver Order") (extending prior waivers "through November 30, 2020"); *Lifeline and Link Up Reform and Modernization*, Order, 35 FCC Rcd. 12954 (Nov. 16, 2020) ("Sixth COVID-19 Waiver Order") (extending prior waivers "through February 28, 2021").

Each of these COVID waiver orders explained that the waivers were in furtherance of the public interest, and some of them gave particular attention to pandemic-related job losses and employment disruptions

affecting the Lifeline subscriber population. *See* Third COVID-19 Waiver Order ¶¶ 5–6; Fifth COVID-19 Waiver Order ¶¶ 3, 8.

### C. The FCC's Seventh COVID-19 Waiver Order

On February 24, 2021, the Bureau released its seventh and final COVID-19 waiver order. *See Lifeline and Link Up Reform and Modernization*, Order, WC Docket No. 11-42 (WCB Feb. 24, 2021) ("Seventh COVID-19 Waiver Order"). Like the waivers before it, the Seventh COVID-19 Waiver Order extended the waiver of the Lifeline usage requirement through a specific future date. But unlike the prior waivers, this one did not extend it through the final date of an upcoming month. Instead, it extended it through the *first* day of May 2021:

> The COVID-19 pandemic continues to have a significant impact on daily life in the United States, underscoring the importance of access to affordable communications services for low-income consumers. In light of the ongoing pandemic, we find good cause to extend, on our own motion, our prior waivers of the Lifeline program rules governing documentation requirements for subscribers residing in rural areas on Tribal lands, recertification, reverification, general de-enrollment, and income documentation through June 30, 2021. However, *we decline to further extend the existing waiver of the Commission's Lifeline usage requirement **beyond May 1, 2021***.

Seventh COVID-19 Waiver Order ¶ 1 (emphasis added) (footnote omitted). A later paragraph in the Order contemplated a resumption of the requirement that ETCs send cure notices, stating, "we extend the waiver and require ETCs to send cure notices to subscribers who, **as of May 1, 2021**, have not used their service *in the **previous** 30-days.*" *Id.* ¶ 10 (emphasis added).

Taken together, these paragraphs indicate the waiver of the usage requirement would continue through, but not beyond, May 1, 2021, and that ETCs must send cure notices, at the earliest, on May 1, 2021, meaning the subscribers' cure period would start, at the earliest, on May 2, 2021—which was both the day *after* the monthly snapshot and the day *after* the waiver's final day. *See id.* ¶¶ 1, 10; *see also* 47 C.F.R. §§ 1.4(c) and 54.407(a); 2015 Lifeline Order ¶¶ 238–43 and n.478.

### D. Petitioners' revision to their April 2021 reimbursement claims and the agency's response.

Following the May 1, 2021 snapshot, Petitioners timely submitted their reimbursement claims for services provided in April 2021. They did not initially seek reimbursement for Lifeline subscribers who on that snapshot date had not used their services in the past 30 days. Subsequently, however, Petitioners learned that other ETCs had sought

and received reimbursement for such Lifeline users for April 2021. *See* Application to FCC for Review at iv, 2, 9–10, 19–20.

Accordingly, in April 2022, Petitioners timely submitted upward revisions to their April 2021 claims. *See id.* at 6.[1] These upward revisions sought reimbursement for Lifeline subscribers who, due to the waiver, (1) should have been included in the May 1, 2021 snapshot even though they had not on that date satisfied the usage requirement and (2) were not yet in their cure period.[2] *See id.*; *see also In the Matter of Lifeline and Link Up Reform and Modernization*, Order on Review, FCC 25-82 at ¶ 4 (Dec. 3, 2025) ("FCC's December 3 Order").

On May 24, 2022, USAC's Director of Operations rejected Petitioners' upward revisions by email, concluding that the non-usage waiver extended only through April 30, 2021, and thus Petitioners could

---

[1] ETCs can submit or revise their reimbursement claims up to a year after the snapshot. *See* Lifeline and Link Up Reform and Modernization et al., WC Docket No. 11-42 et al., Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd. 6656, 6788, ¶ 305 (2012) (establishing a "one-year deadline . . . for ETCs to reconcile their records and submit original or revised FCC Form 497s to USAC.").

[2] Two additional ETCs joined Petitioners in submitting upward revisions and requests for review with the Bureau but did not file Applications for Review with the FCC. *Lifeline and Link Up Reform and Modernization*, Order on Review, WC Docket No. 11-42 ¶ 1 & n.4 (WCB Dec. 3, 2025).

not receive reimbursements for subscribers who, at the time of the May 1 snapshot, had not satisfied the Lifeline usage requirement. *Id.*; *see also* Application to FCC for Review at Exhibit C.

Petitioners appealed that decision through all three stages of agency review. First, they formally appealed to USAC the email denial of their upward revisions for April 2021 reimbursements. USAC denied Petitioners' appeal on November 16, 2023. According to USAC, Petitioners' "upward revision included subscribers who *were* in their non-usage cure period on May 1, 2021, and were therefore not eligible to be claimed for the April 2021 data month." *See* Application to FCC for Review at Exhibit B (emphasis added).

Next, Petitioners filed Requests for Review of USAC's decision with the Bureau on January 12, 2024. The Bureau denied the Requests on August 8, 2024. *See* Application to FCC for Review at Exhibit A. The Bureau's Order didn't even mention or cite to (much less grapple with) the critical language from the first paragraph of the Seventh COVID-19 Waiver Order in which the FCC had stated that the usage waiver would not extend "beyond May 1, 2021." And the Bureau brushed away the specific waiver language regarding the need to send cure notices "as of

14

May 1, 2021," and, instead, recited the older, generic FCC rule stating that ETCs should send notices "on" the 30th day of non-usage. *See id.* at 4 ¶ 8.[3]

On September 9, 2024, Petitioners filed Applications for Review with the FCC. *See* Applications to FCC for Review. The FCC denied the applications by written order on December 3, 2025. *See* FCC's December 3 Order at ¶ 1 & n.4. The FCC's analysis, like the Bureau's before it, proceeded in a circuitous way to reach its apparently preordained conclusion. The FCC first declared (incorrectly) that the Seventh COVID-19 Waiver Order "declined to further extend the waiver of the non-usage rule," but later conceded that it "extended the waiver for a short period through April 30, 2021," *id.* at ¶ 3—never mind the fact that the Seventh COVID-19 Waiver Order neither mentions April 30 nor uses the language consistently employed in the prior waivers by extending the waiver "through" a specific date on the last day of a month, and never

---

[3] In addition to the fact that an older, generic agency rule must yield to the agency's more recent and specific waiver of that rule, the FCC's 30th-day rule suffers from the additional problem that it is contrary both to the regulatory text and logic. *See* pages 30–31, *infra.*

mind the plain language saying the waiver won't extend "*beyond* May 1, 2021" (emphasis added).[4]

As to the critical language in Paragraph 1 of the Seventh COVID-19 Waiver Order, the FCC concluded it means nothing because the key phrase—"we decline to further extend the existing waiver of the Commission's Lifeline usage requirement beyond May 1, 2021"—was a "negative statement" rather than an affirmative one. *Id.* ¶ 8. In the FCC's view, that phrase (which is the sole part of the order indicating when the usage waiver would conclude) indicates only "what the Bureau was *not* doing" and nothing at all about what it *was* doing. *Id.* (emphasis in original).

Turning to the Waiver Order's requirement that ETCs "send cure notices . . . *as of May 1*, 2021," the FCC brushed past that date and, instead, concluded that the date for these cure notices should be determined not by plain language of the order waiving the normal rules, but by the prior, generic FCC rule stating that cure notices should be sent

---

[4] As if in hopes that repeating it often enough will make it true, the FCC summarily asserted at least nine times in its December 3 Order that the Lifeline usage waiver ended on April 30, 2021 pursuant to the Seventh COVID-19 Waiver Order. *See id.* at ¶¶ 3, 7, 8, 10, n.34, n.50, and Statement of Chairman Carr.

*on* the 30th day of non-usage (so, April 30, 2021, in the FCC's view). *Id.* at ¶ 7 and n.34; *see also id.* ¶ 9 (acknowledging, but not heeding, the interpretive rule that the older, generic rule should govern only "in the absence of a more specific rule").

In sum, the FCC waved off the plain language of the Seventh COVID-19 Waiver Order, reached its preferred result, and denied Petitioners' Application for Review. This appeal followed.

<span style="font-variant:small-caps">**Summary of the Argument**</span>

This Court should grant Petitioners' petition for review and vacate the FCC's Order for the following reasons:

I.    The plain text of the Seventh COVID-19 Waiver Order states that Petitioners are entitled to reimbursement for subscribers who did not use their services in April 2021. The first paragraph of the Seventh COVID-19 Waiver Order expressly says that the usage waiver will not extend "*beyond* May 1, 2021" (emphasis added). There's only one ordinary, common use, plain language way to read that language: the waiver remained in effect *on* May 1, 2021, but does not extend past or *beyond* that day. Similarly, since the order required ETCs to send cure notices based on information available "as of May 1, 2021," the earliest

17

the cure period could begin was May 2, 2021, meaning those subscribers were not yet in their cure period on the May 1 snapshot. Petitioners should be reimbursed for all April 2021 Lifeline subscribers captured on the May 1 snapshot.

If additional support for this plain language reading is needed, it can be found in canons of textual interpretation and construction. Every prior Lifeline Waiver Order provided that the waiver would be extended until the last day of the applicable month. If that's what the Seventh and final COVID-19 Waiver Order was meant to do, it would have used the same language as the prior waiver orders. It didn't. That change means something. Under the applicable canons, the agency is presumed to have acted purposely in changing the language in the Seventh COVID-19 Waiver Order to the first day of the following month, rather than the last day of a month like the previous six orders. The Court therefore should read the new and distinct language in the Seventh COVID-19 Waiver Order to be applied differently to reimbursements.

Because the FCC's interpretation of the Seventh COVID-19 Waiver Order is contrary to its plain language and meaning, the FCC's decision to deny Petitioners reimbursements for April 2021 is arbitrary and

capricious. Petitioners' reading of the plain language of the Order is the *only* reading that harmonizes the relevant sections and dates in the Order. The Court should accordingly vacate the December 3 Order.

II.   The Court should not defer to the FCC's interpretation of the Seventh COVID-19 Waiver Order. An agency's view may warrant deference when the agency reasonably interprets its own "genuinely ambiguous" regulations. The Seventh COVID-19 Waiver Order, however, is not genuinely ambiguous. But even if this Court were to find the Seventh COVID-19 Waiver Order ambiguous and reach the question of whether deference should be afforded, the Court should nevertheless find that deference is inappropriate here because the FCC's interpretation is not reasonable, does not implicate its substantive expertise, and is not a fair and considered judgment.

The FCC's interpretation of its own Order is not reasonable because it contradicts the plain language of the Order. Its substantive expertise is not implicated because a plain reading of the end date of a waiver in no way requires the substantive expertise of the FCC regarding communications policy. And the FCC's interpretation—in which it inserted its preferred date in brackets because that date did not appear

anywhere in the Order it was interpreting—does not reflect fair and considered judgment.

III. Finally, the FCC violated the requirement that it act in the public interest when it denied reimbursement for Lifeline subscribers who did not use their services during April 2021, despite the non-usage requirement being waived during that month. The FCC had previously and repeatedly stated the reason for its COVID-19 Waiver Orders was to further the public interest by eliminating risks to public health and by accommodating subscribers who, due to the pandemic, were disrupted from their normal work and routines. Yet here, the FCC elected to interpret the Seventh COVID-19 Waiver Order—in contradiction of its plain language—to deny reimbursement for all Lifeline subscribers who did not use their services during April 2021, despite the continued public health risks associated with the pandemic and the explicit waiver of the non-usage requirement during that month. By ignoring the plain language of its own Order to justify denying one month of Lifeline reimbursements for discounted services already provided, the FCC acted contrary to the public interest, and its Order should be vacated as arbitrary and capricious for this reason as well.

## STANDARD OF REVIEW

Agency action is reviewed under the Administrative Procedure Act's arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A). Arbitrary and capricious review asks "whether [the] agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) (quoting *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004)). Under this standard of review, the FCC's factual findings must be supported by "substantial evidence." 5 U.S.C. § 706(2)(E); 47 U.S.C. § 402(g). Substantial evidence involves "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 718 F.3d 488, 495 (5th Cir. 2013) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). On questions of law, courts accord deference to an agency's interpretation of its own regulations only if they are ambiguous. *See Tex. Clinical Labs v. Sebelius*, 612 F.3d 771, 777 (5th Cir. 2010).

**I.    The text of the Seventh COVID-19 Waiver Order mandates that Petitioners are entitled to reimbursement for April 2021 non-users.**

This appeal involves an important but straightforward question of the correct interpretation of an agency order. Accordingly, the Court looks first to the text of that order and its plain meaning. "We interpret [agency] regulations in the same manner as statutes, looking first to the regulation's plain language." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 573 (5th Cir. 2017); *see also Cash v. Conn. Appliances, Inc.*, 2 F. Supp. 2d 884, 890 n.3 (E.D. Tex. 1997) (interpreting agency rules and noting that "[p]rinciples of statutory interpretation guide construction of rules" (citing 1A Norman J. Singer, SUTHERLAND STATUTORY CONSTRUCTION § 31.06 (5th ed.1993)). Here, because that language is unambiguous, the Court's analysis should start—and can end—with the plain text of the Seventh COVID-19 Waiver Order. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The inquiry begins with the statutory text and ends there as well if the text is unambiguous.").

**A.** **The plain language of the Seventh COVID-19 Waiver Order establishes that the non-usage rule remained waived on May 1, 2021.**

The operative language is found in the first paragraph of the Seventh COVID-19 Waiver Order, which states that the FCC "decline[s] to further extend the existing waiver . . . *beyond* May 1, 2021" (emphasis added). *See* Seventh COVID-19 Waiver Order ¶ 1. There's only one ordinary, common use, plain language way to read that language: the waiver remained in effect *on* May 1, 2021—*i.e.*, it *includes* May 1, 2021— but does not further extend past or *beyond* that day, and Petitioners should be reimbursed for all April 2021 Lifeline subscribers captured on the May 1 snapshot.

That's the ordinary, common-sense, ubiquitous way that people use the word "beyond" when referring to a span of time. *See Thomas v. Bryant*, 919 F.3d 298, 306 (5th Cir. 2019) (interpreting statutory phrases by considering "how ordinary people speak and write"). For example, if houseguests say they "won't be staying beyond the weekend," you know they'll be with you *on* Saturday and Sunday, but not Monday. If a class syllabus says that "assignments won't be accepted beyond the last day of class," it means the professor will accept them *on* the last day of class,

but not the next day or thereafter. And if an advertisement proclaims that "Black Friday pricing is for a limited time only and won't extend beyond Monday!," every bargain hunter understands the discounted price is still available *on* Monday, but not after that. So too here, where a plain language reading of the Bureau's statement that it would not extend the usage waiver "beyond May 1, 2021" indicates that the waiver was still in force *on* May 1, but not thereafter. The ordinary usage, meaning, and understanding of the phrase are plainly apparent, and they support Petitioners' view. *See Thomas*, 919 F.3d at 306; *see also Fernandez v. Seaboard Marine LTD*, 135 F.4th 939, 961 (11th Cir. 2025) (Jordan, J. concurring) ("[S]tatutory interpretation should take into account the way people usually speak and how they use language in everyday conversations"); *United States v. Caniff*, 955 F.3d 1183, 1187–88, 1189 (11th Cir. 2020) (stating that, consistent with other circuits' approaches, undefined terms "must be given their ordinary or common, everyday meanings," by looking at how "the average speaker of American English" would typically use them).

This common-usage interpretation finds support in another source often used to determine the meaning of words—dictionaries. *See, e.g.,*

*Fire Protection Serv., Inc. v. Survitec Survival Prods., Inc.*, 153 F.4th 439, 445 & n.5 (5th Cir. 2025) (looking to dictionaries to determine the ordinary meaning of a term, noting that "[i]n construing undefined statutory terms," courts "look to dictionary definitions" (internal quotation marks omitted)). Dictionaries uniformly establish that when the word "beyond" is used temporally, it refers to a time *after* the stated date has passed. *See, e.g.*, Collins Dictionary, ("If something happens beyond a particular time or date, it continues *after* that time or date has *passed.*") (emphasis added);[5] Cambridge Dictionary (stating that the temporal use of "beyond" describes something "continuing *after* a particular time or date") (emphasis added);[6] Britannica Dictionary (defining the temporal use of "beyond" as "a period of time that continues *after* a particular date") (cleaned up).[7] When, as here, a time period does not extend "beyond" a stated date, the time period includes the stated date but doesn't continue *after* that date has passed.

---

[5] https://www.collinsdictionary.com/us/english-language-learning/beyond (last visited May 13, 2026).

[6] https://dictionary.cambridge.org/us/dictionary/learner-english/beyond (last visited May 13, 2026).

[7] https://www.britannica.com/dictionary/beyond (last visited May 13, 2026).

Few courts have needed to engage with this question of construction (perhaps because it is so obvious as to not require judicial interpretation); however, at least one court has noted that an agency's statement that it "will not extend" a time period "beyond" a date certain meant that the time period *included* the date certain. *See US Air, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1257 (D.C. Cir. 1992) (noting that an agency decision had stated that it "will not extend the statutory deadline for a [final] decision beyond April 1, 1991," and that the parties and the agency's Public Counsel subsequently recognized "the statutory deadline in the case *as* April 1, 1991") (alteration in original) (emphasis added).

Similarly, this Court's own rules use the word "beyond" to refers to a time period that *includes* the final day but does not continue *after* the stated date has passed. *See* 5th Cir. R. 11.2 ("Court reporters seeking extensions of the time for filing the transcript *beyond* the 30 day period fixed by Fed. R. App. P. 11(b) must file an extension request with the clerk of this court . . ." (emphasis added)). No one doubts that a court reporter could file a transcript *on* the 30th day without seeking an extension. The defined time period includes, but does not continue after ("beyond") that day. The same is true here, too.

The ordinary, common usage meaning of the first paragraph of the Seventh COVID-19 Waiver Order is that the usage waiver remained in effect *on* May 1, 2021, but does not extend past or *beyond* that day. The FCC erred and acted arbitrary and capriciously by concluding otherwise.

**B.    The plain language of the Seventh COVID-19 Waiver Order establishes that the cure notices were to be sent no sooner than May 1, 2021.**

The second portion of the relevant language in the Seventh COVID-19 Waiver Order is in its tenth paragraph, which extends—but sets an outer limit on—the waiver of the requirement that ETCs send cure notices. That paragraph states:

> Therefore, at the expiration of the waiver period, ETCs must send notice to subscribers who have not used their service in the previous 30 days and notify those subscribers that they have 15 days to cure their non-usage. Recognizing that ETCs may be responsible for sending a larger number of non-usage notices and that many ETCs start the outreach required by this rule long before the expiration of the usage period, we extend the waiver and require ETCs to send cure notices to subscribers who, ***as of*** May 1, 2021, have not used their service in the previous 30-days.

*See* Seventh COVID-19 Waiver Order ¶ 10 (emphasis added). As with the first paragraph of the waiver order, there's only one ordinary, common use, plain language way to read that language: ETCs must send cure

notices to the relevant subscribers on *May 1 at the earliest*, not on April 30 as the FCC later claimed.

When, as here, a determination or event is set to happen "as of" a specified date, it means the determination, or event must occur *on* (or after) that date, not before it. Courts have reached this conclusion in a variety of contexts. For example, if a candidate for Congress must be a district resident "as of" the election, his eligibility can't be assessed until election day itself. *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) (discussing the residency requirement, using the phrases "as of election day" and "on election day" synonymously, and holding that the determination of residency could be made only on election day, not before). Similarly, a statute requiring that an assessment be made "as of" a given date means the determination must be made on or after that date based on information available on, not before, that date. *See Trustees of IAM National Pension Fund v. Ohio Magnetics, Inc.*, 656 F.Supp.3d 112, 125–26 (D.D.C. 2023) (interpreting language requiring a determination "as of" a specific date and noting that "[a]lthough much of the language used in ERISA is technical in nature, the phrase 'as of' is not. It simply means 'at or on (a specific time or date),' [] or 'as things stood on (a date),'"

and concluding the determination is thus "based on a snapshot . . . as things stood on the measurement date") (citations omitted).

Dictionaries, too, confirm Petitioners' view. *See* Webster's Third New International Dictionary 129 (2002) (defining "as of" to mean "at or on (a specific time or date)"); American Heritage Dictionary (defining "as of" to mean "On; at");[8] Oxford English Dictionary (defining "as of" to mean "As things stood on (a date)").[9]

This interpretation also dovetails with the plain language of paragraph one of the Seventh COVID-19 Waiver Order, which extended the waiver of the usage rule through May 1. Because, under paragraph 10, the cure notices were required to be sent on May 1 at the earliest, that means the cure period began, at the earliest, on May 2. *See* 47 C.F.R. § 1.4(c) (stating that a period commencing by an act begins the day *after* the act); *see also* 2016 Lifeline Order at 4115, ¶ 415 (noting a Lifeline subscriber can cure his non-usage by using services "during the *subsequent* 15 days" after the cure notice is sent) (emphasis added); 2019

---

[8] https://ahdictionary.com/word/search.html?q=as+of (last visited May 13, 2026).

[9] https://www.oed.com/search/dictionary/?scope=Entries&q=as+of (last visited May 13, 2026).

Lifeline Order at 10936, ¶ 116 (2019) ("2019 Lifeline Order") (same). Those subscribers were, therefore, properly included in the May 1 snapshot on the final day of the usage waiver, as they had not yet entered their cure period.

The FCC's conclusion to the contrary—that the cure notices should have been sent on the 30th day of non-usage (i.e., on April 30, 2021), *see* FCC's December 3 Order at ¶ 7 and n.34—is contrary both to the regulatory text and common sense. The relevant regulation never says ETCs are to send cure notices *on* the 30th day of non-usage.[10] Instead, it requires ETCs to send cure notices when a subscriber "fails to use" his

---

[10] In contrast, when the FCC intends for a regulation to require or permit action on a particular day or on the concluding day of a period, it knows how to do so, and it specifically says so. *See*, *e.g.*, 47 C.F.R. § 1.13(a)(1) (requiring action "by 5:30 p.m. Eastern Time on the tenth day of the filing period"); *id*. § 36.4 (permitting action "on the 60th day"); *id*. § 51.333(b)(2) (notices shall be deemed final "on the 90th day" or "on the 15th day"); *id*. § 63.12(b) (a carrier may begin operation "on the 15th day"); *id*. § 73.3580(b)(1)(iii) & (2)(iv) (requiring action "not later than the fifth business day"). The FCC regulation about Lifeline cure notices didn't use that language.

Indeed, this distinction is apparent even *within* the regulation governing the Lifeline program. In that regulation, four subsections (but not the one requiring ETCs to send cure notices) state that ETCs must act *during* a specified time period. *See id*. § 54.405(e)(1), (2), and (4) (requiring ETCs to act "*within* five business days" of a subscriber's action or inaction) (emphasis added); *id*. § 54.405(e)(5) (same, "*within* two business days") (emphasis added). The subsection about cure notices, however, does not.

Lifeline service "for 30 consecutive days." 47 C.F.R. § 54.405(e)(3). Because a subscriber can use his service at any time of day, an ETC can't know until the *conclusion* of the 30th day (*i.e.*, 11:59:59 p.m. of the 30th day) whether the subscriber has accumulated 30 consecutive non-usage days. So, the earliest an ETC could send the notice would be the next day—the 31st day (i.e., May 1, 2021).

The fact that the FCC's 2016 Lifeline Order and 2019 Lifeline Order opine that ETCs should send cure notices on the 30th day doesn't alter this conclusion. For one, that view is contrary to the regulatory text and common sense, as already noted. Furthermore, the older, generic rule found in the 2016 and 2019 Lifeline Orders must yield to the more recent, specific exception found in the Seventh COVID-19 Waiver Order, which states the notices should be sent "as of May 1." *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."); *St. Tammany Parish v. FEMA*, 556 F.3d 307, 318 n.6 (5th Cir. 2009) (same); *I.C.C. v. S. Ry. Co.*, 543 F.2d 534, 539 (5th Cir.1976) (noting that when an earlier enactment differs from a subsequent one, "the subsequent enactment governs"); Antonin Scalia & Bryan A. Garner, READING LAW:

THE INTERPRETATION OF LEGAL TEXTS 183 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails. . . . Under this cannon, the specific provision is treated as an exception to the general rule.") (citations omitted).

In sum, the Seventh COVID-19 Waiver Order required ETCs to send cure notices based on information and a determination available "as of May 1, 2021." That means the notices could be sent only on or after that date. The FCC's conclusion to the contrary was erroneous, arbitrary, and capricious.

**C.  Canons of textual interpretation and construction support Petitioners' plain-language interpretation.**

As explained above, the plain language of the Seventh COVID-19 Waiver Order, standing alone, is a sufficient basis to reverse the agency's decision. But if further confirmation of that interpretation is needed, it can be found in the canons of construction. *See Green v. Brennan*, 578 U.S. 547, 553–54 (2016) (noting that while the Court will "begin our interpretation of the regulation with its text," it can also look to "canons of interpretation" for confirmation or elucidation); *see also Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) ("Before concluding that rule is genuinely

ambiguous, a court must exhaust all the traditional tools of construction.").

Start by considering the fact that the language of the Seventh COVID-19 Waiver Order differed from all those before it. As discussed above, every prior Lifeline Waiver Order provided that the waiver would be extended until the last day of the applicable month. *See* Second COVID-19 Waiver Order (temporarily waiving usage requirements until May 29, 2020); Third COVID-19 Waiver Order (extending prior waivers through June 30, 2020); Fourth COVID-19 Waiver Order (extending prior waivers through August 31, 2020); Fifth COVID-19 Waiver Order (extending prior waivers through November 30, 2021); Sixth COVID-19 Waiver Order (extending prior waivers through February 28, 2021).

The Seventh and final COVID-19 Waiver Order, however, provided that the Bureau declined to further extend the waiver of the non-usage rule "beyond May 1, 2021." *See* Seventh COVID-19 Waiver Order ¶ 1. And unlike any of the prior COVID-19 Waiver Orders, it directed ETCs to "send cure notices . . . as of May 1, 2021"—a syntactical formulation never used in the prior orders. As explained below, these changes in language are material under the applicable canons of interpretation, and

33

the Court should accordingly find that the Seventh COVID-19 Waiver Order meant something different when determining which subscribers were included on that particular "snapshot" date for Lifeline reimbursements.

First, under the "reenactment canon," when the enactor of a statute, regulation, or order amends an existing provision, a change in language is presumed to entail a change in meaning. *See, e.g.*, *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020) (noting that the canon "provides that whenever Congress amends a statutory provision, 'a significant change in language is presumed to entail a change in meaning.'") (citation omitted); *In re Harvey*, 84 B.R. 197, 201 n.1 (D. Colo. Bankr. 1988) (noting the "general rule that a change in the language of a statute or regulation indicates an intent to change its meaning and alter prior law"); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 256–57 (2012) (explaining the reenactment canon, which provides that "a change in the language of a prior statute presumably connotes a change in meaning" where the changes are not merely "stylistic or nonsubstantive").

Here, the relevant language of the Seventh COVID-19 Waiver Order differed materially from the prior Waiver Orders. The prior Waiver Orders expressly stated that the waiver extended through the final day of the month—the 28th, 30th, or 31st, depending on the month. In those instances, then, it's not surprising that the waiver remained in force only through the end of the final day of that month and did not include the first day of the following month. The Seventh COVID-19 Waiver Order, however, used different language than all the prior Orders and provided that the waiver did not extend beyond May 1, 2021—the first day of the next month. This distinction is presumed to mean something.[11] The Bureau clearly knew what language to employ when it intended for the usage waiver to include and end on the final day of the month. The fact that the Bureau used different language in the Seventh COVID-19 Waiver Order indicates that it means something different.

Similarly, the *Russello* canon, or the canon of inclusion/exclusion, provides that differing language is presumed intentional. "[W]here

---

[11] It also contradicts the FCC's primary reason for denying Petitioners' Applications for Review, *i.e.*, that its "interpretation of the Seventh COVID-19 Waiver Order is consistent with . . . prior COVID-19 waiver orders." *See* December 3 Order ¶ 7.

Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir. 1972); *see also Russello v. United States*, 464 U.S. 16, 22–23 (1983). This canon applies to agency regulations, too. *See Dominion Ambulance, L.L.C. v. Azar*, 968 F.3d 429, 435–36 (5th Cir. 2020) (noting that applying *Russello* canon to agency regulations is "reasonable"). Here, the Bureau is presumed to have acted purposely in changing the language in the Seventh COVID-19 Waiver Order to the first day of the following month, rather than the last day of the month like the previous six orders. The Court therefore should read the new and distinct language in the Seventh COVID-19 Waiver Order to be applied differently to reimbursements.

**D.** **The FCC's interpretation is arbitrary and capricious because it is contrary to the plain language and ordinary meaning of the Order.**

When, as here, an agency's interpretation or application of its regulations, rules, or orders is contrary to the plain language of the regulations, rules, or orders, the agency's position is deemed arbitrary and capricious under the APA and is subject to reversal. *See Motor*

*Vehicle Mfg. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); *Neumann's Pharmacy, L.L.C. v. Drug Enf't Admin.*, 167 F.4th 320, 328 (5th Cir. 2026) (vacating agency's order because the "decision rest[ed] on interpretations the governing texts will not bear").

In its December 3 Order, the FCC interpreted the Seventh COVID-19 Waiver Order to provide that the waiver ended on April 30—not May 1—and that cure notices were to be sent on April 30, 2021. *See* December 3 Order ¶ 7. In doing so, the FCC ignored the plain language of the Seventh COVID-19 Waiver Order stating that the order would not extend "beyond May 1, 2021"; indeed, the FCC had to add the date of "April 30" in brackets to its quote from the Seventh COVID-19 Waiver Order to make its finding, as the date April 30, 2021 appears *nowhere* in the Seventh COVID-19 Waiver Order. *See id*. ("Moreover, the Seventh COVID-19 Waiver Order requires that 'at the expiration of the waiver period [i.e., April 30], ETCs must send notice to subscribers' that they

have the next 15 days (i.e., May 1 through May 15) to cure their non-usage.") (bracketed alteration made by the FCC).

The FCC's decision to deny Petitioners' Applications for Review based on an interpretation of the Seventh COVID-19 Waiver Order that is contrary to its plain language and meaning is arbitrary and capricious, and the Court should accordingly vacate the December 3 Order. *See Neumann's Pharmacy*, 167 F.4th at 323, 328 (vacating an agency's order because the agency "misinterpreted its own regulations" and its "decision rest[ed] on interpretations the governing texts w[ould] not bear"); *Univ. of Cincinnati v. Bowen*, 875 F.2d 1207, 1208 (6th Cir. 1989) (holding that the Secretary of Health and Human Service's interpretation of the applicable Medicare regulations was arbitrary and capricious because it was inconsistent with the regulations' plain language).

## E. Petitioners' interpretation harmonizes all relevant sections of the Seventh COVID-19 Waiver Order.

Unlike the FCC's contrived and internally dissonant interpretation of the Seventh COVID-19 Waiver Order, Petitioners' interpretation alone harmonizes the relevant sections and dates in the Order.

Start with Paragraph 1, which indicates that the waiver extends through, but not after, May 1, 2021. *See* Seventh COVID-19 Waiver

Order ¶ 1 (stating the Bureau declined "to further extend the existing waiver of the Commission's Lifeline usage requirement *beyond* May 1, 2021" (emphasis added)). As discussed above, a plain reading of this text is that the waived period includes May 1, 2021.

Paragraph 9 (which the FCC purported to rely on below) aligns perfectly. That paragraph notes that the FCC declined "to extend the previous waiver of the Commission's non-usage rule for the Lifeline program by four months" or to extend "the total non-usage period from 30 days to 180 days," and noted the FCC's desire to bring the waiver period to an orderly conclusion. *See* Seventh COVID-19 Waiver Order ¶ 9. But it says nothing inconsistent with Petitioners' plain language interpretation of Paragraph 1 and nothing to support of the FCC's post hoc wish that it had instead ended the usage waiver on April 30, 2021.

Then, Paragraph 10 provides that ETCs were required to send cure notices to subscribers who, "as of May 1, 2021," had not used their service for 30 days. *Id.* at 10 ("[W]e extend the waiver and require ETCs to send cure notices to subscribers who, *as of May 1*, 2021, have not used their service in the previous 30 days." (emphasis added)). Sending the notices no earlier than the final day of the waiver (May 1) fits neatly with

Petitioners' interpretation of Paragraph 1 because, as discussed above, under 47 C.F.R. § 1.4(c) the cure period would thus start no earlier than May 2, 2021. So, on May 1, with the usage waiver still in place, Lifeline subscribers who had not used service during the month of April were not yet in their cure period and could be included in the May 1 snapshot for reimbursement.

There is nothing inconsistent about sending the cure notices on the last day of the waiver period (May 1) because the final waiver of the usage requirement and the requirement to send cure notices have separate, independent purposes. The former ensured that low-income subscribers didn't lose service in March and April; the latter ensured that if they weren't using the services and that non-usage continued *after* the waiver expired, their unused accounts wouldn't remain in the Lifeline program thereafter. Petitioners' interpretation of the waiver order, unlike the FCC's, synthesizes these sections in a congruous way that's also consistent with their plain meaning.

## II. The Court should not defer to the FCC's interpretation of the Seventh COVID-19 Waiver Order.

The Court's analysis should begin and end with the plain language of the Seventh COVID-19 Waiver Order. Because it is unambiguous,

there is no need to reach the question of whether the Court should defer

to the FCC's interpretation. Even if the Order were ambiguous, deference

to the agency isn't warranted. Each argument is explained in turn below.

**A.  The Seventh COVID-19 Waiver Order is not genuinely ambiguous.**

An agency may receive deference only when it reasonably interprets

its own "genuinely ambiguous" regulations:

> [A] court should not afford *Auer* deference unless the regulation is genuinely ambiguous. [] If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law.

*Kisor v. Wilkie*, 588 U.S. 558, 573 (2019) (citations omitted); *see also Auer*

*v. Robbins*, 519 U.S. 452, 461 (1997). The Court made it clear in *Kisor*

that when "there is only one reasonable construction," a court should not

defer to any other interpretation, even if the agency "insists it would

make more sense." *Id.* at 575. Such deference would effectively amount

to an impermissible promulgation of a new regulation. *Id.*

The Seventh COVID-19 Waiver Order is not genuinely ambiguous.

As discussed above, the plain language of the Order states that the

waiver shall not extend "beyond" May 1, 2021, providing that the last day

the waiver remained in force was May 1, 2021. The "traditional tools" of textual construction confirm this interpretation. *See Kisor*, 588 U.S. at 575 ("[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the traditional tools of construction."). That the agency has a different interpretation is immaterial:

> [I]f the law gives an answer—if there is only one reasonable construction of a regulation—then a court has no business deferring to any other readings, no matter how much the agency insists it would make more sense. Deference in that circumstance would permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.

*Id.* (cleaned up). Even if the Court were to find the issue complex—and Petitioners submit it is not—this does not automatically put the Order in realm of ambiguity. As the Supreme Court held in *Kisor*,

> [A] court cannot wave the ambiguity flag just because it found the regulation impenetrable on the first read. Agency regulations can sometimes make the eyes glaze over. But hard interpretive conundrums, even relating to complex rules, can often be solved. To make that effort, a court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on. Doing so will resolve many seeming ambiguities out of the box, without resort to *Auer* deference.

*Id.* (cleaned up).

Indeed, the FCC itself agrees that the Seventh COVID-19 Waiver Order is not ambiguous. *See* December 3 Order ¶ 7 ("Even assuming *arguendo* that the Seventh COVID-19 Waiver Order was genuinely ambiguous—which it is not, based on its text, structure, history, and purpose . . . ." (cleaned up)). Because the Seventh COVID-19 Waiver Order is not ambiguous, deference to the agency's views is not warranted.

**B.    Even if the Court were to find the Order ambiguous, deference is not warranted.**

Even if the Court were to find the Seventh COVID-19 Waiver Order ambiguous and reach the question of whether deference should be afforded, it should find that deference is nevertheless inappropriate here. Ambiguity is necessary but not sufficient for the Court to afford deference. "[T]he agency's reading must still be reasonable." *Kisor*, 588 U.S. at 575. Even then, "not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference." *Id.* at 576.

The Supreme Court has set forth five guiding principles to determine whether an agency's interpretation of its own regulations is entitled to deference. First, as already discussed above, the regulation must be "genuinely ambiguous, even after a court has resorted to all the

standard tools of interpretation." *Id.* at 574. Second, the agency's reading must be "reasonable[,]" and "must come within the zone of ambiguity the court has identified[.]" *Id.* at 575–76. Third, the interpretation at issue "must be one actually made by the agency" in its official capacity. *Id.* at 576. That is, "it must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 257–59, 258 n.6 (2001) (Scalia, J., dissenting)). Fourth, "the agency's interpretation must in some way implicate its substantive expertise." *Id.* at 577. Finally, "an agency's reading of a rule must reflect 'fair and considered judgment' to receive . . . deference." *Id.* at 579 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). For example, "a court should decline to defer to a merely convenient litigating position or post hoc rationalization advanced to defend past agency action against attack [or] to a new interpretation that creates unfair surprise to regulated parties." *Id.* at 559, 579 (cleaned up).

Here, even if the Court were to find the Seventh COVID-19 Waiver Order genuinely ambiguous, the FCC is not entitled to deference because

its interpretation is not reasonable, does not implicate its substantive expertise, and is not a fair and considered judgment.

### 1. The FCC's interpretation of the Seventh COVID-19 Waiver Order is not reasonable.

For many of the reasons already discussed, the FCC's interpretation of its own Order is not reasonable, largely because it contradicts the plain language of the Order. "As there is no zone of ambiguity, the [agency's] interpretation cannot be 'reasonable.'" *Nat'l Auto. Dealers Ass'n v. Fed. Trade Comm'n*, 127 F.4th 549, 559 (5th Cir. 2025). "Under *Auer*, the agency's reading must fall within the bounds of reasonable interpretation. And let there be no mistake: That is a requirement an agency can fail." *Kisor*, 588 U.S. at 576 (cleaned up). The FCC's view requires lexical gymnastics and "quotations" from the Seventh COVID-19 Waiver Order that contain bracketed alterations to the language. *See* December 3 Order ¶ 7. It's not a reasonable view, and it's not entitled to deference.

### 2. The Seventh COVID-19 Waiver Order does not implicate the FCC's substantive expertise.

A plain reading of the end date of a waiver in no way involves the substantive expertise of the FCC regarding communications policy. The

Court can interpret the meaning of the key phrase—"decline to further extend . . . beyond May 1, 2021"—just as well as (and probably better than) anyone at the FCC. Determining whether the word "beyond" includes the date listed does not implicate specialized, technical, or substantive agency expertise, and the FCC is, therefore, not entitled to deference. *See, e.g.*, *Nat'l Auto. Dealers Ass'n v. Fed. Trade Comm'n*, 127 F.4th 549, 559 (5th Cir. 2025) (holding that the FTC's interpretation of its own rules did not "implicate its substantive expertise" because "[t]he question of administrative procedure—a legal question—does not require the FTC's comparative expertise in administering trade policy, but is one that falls more naturally into a judge's bailiwick." (cleaned up)).

> **3.    The FCC's interpretation of the Seventh COVID-19 Waiver Order is nothing more than a post hoc rationalization or convenient litigating position.**

Finally, the FCC's interpretation—in which it inserted its preferred date in brackets because that date did not appear anywhere in the Order it was interpreting—does not reflect fair and considered judgment. "[A] court should decline to defer to a merely convenient litigating position or post hoc rationalization advanced to defend past agency action against attack [or] to a new interpretation that creates unfair surprise to

regulated parties." *Kisor*, 588 U.S. at 559, 579 (cleaned up). The FCC's decision to disallow April 2021 reimbursements based on an interpretation of the Seventh COVID-19 Waiver Order that contradicts the plain language reflects nothing more than a post hoc rationalization or convenient litigating position, and the FCC should accordingly be denied deference.

**III. The FCC violated the requirement that it act in the public interest when it denied reimbursement for discounted service provided to Lifeline subscribers who did not use their services during April 2021, despite the usage requirement being waived during that month.**

Finally, the FCC's interpretation of the Seventh COVID-19 Waiver Order was also arbitrary and capricious because it was contrary to the public interest. The purpose of the Lifeline program—and of the COVID Waiver Orders—is "to ensure that low-income consumers ha[ve] access to affordable, landline telephone service." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1106 (D.C. Cir. 2019); *see* 2019 Lifeline Order ¶ 121 ("We also note that the alternative to the 15-day cure period is to require an ETC to immediately de-enroll a subscriber from the Lifeline program on day 30 of non-usage, which would result in the subscriber's service being

disconnected with no notice to the subscriber *and would therefore be contrary to the public interest.*" (emphasis added)).

Indeed, the very purpose of the FCC itself is to make available, in the public interest, to all people of the United States, communications services at reasonable prices. *See AT&T, Inc. v. Fed. Commc'ns Comm'n,* 886 F.3d 1236, 1241 (D.C. Cir. 2018) ("A core mission of the FCC, dating from its establishment in 1934 by the Communications Act, is to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and word-wide communication service with adequate facilities at reasonable charges . . . the Commission must periodically redefine the level of services that should be universally available to keep pace with technological advancements, need, use, and the public interest." (cleaned up)).

"[A]n agency action is arbitrary and capricious if the agency fails to demonstrate in the record that it has examined the relevant data and articulated a satisfactory explanation for its action. *Motor Vehicles Mfrs.,* 463 U.S. at 43. The FCC has articulated no satisfactory explanation for its interpretation of the Seventh COVID-19 Waiver Order but has instead acted squarely in opposition to the public interest. The FCC's stated

reason for the COVID-19 Waiver Orders was to further the public interest by eliminating risks to public health. *See* First COVID-19 Waiver Order ¶ 7 ("Because we recognize the importance of connectivity for all Americans during this pandemic, we do not believe that the public interest would be served by de-enrolling Lifeline subscribers who are unable to complete the recertification process or reverification process over the next 60 days"); Second COVID-19 Waiver Order ¶ 8 ("We find that, in light of the coronavirus pandemic and community efforts to slow its spread, including recent shelter-in-place orders and guidelines on social distancing, requiring Lifeline subscribers to potentially leave their homes either to gather the necessary documentation to prove their continued eligibility in the program or to re-enroll in the Lifeline program after being de-enrolled for non-usage would create a potential risk to public health and be contrary to the public interest."); *see also* Sixth COVID-19 Waiver Order ¶ 3 n.6 ("We find, however, that the public interest in ensuring that subscribers have the Lifeline service active if they need it during this pandemic outweighs the cost of extending the non-usage waiver").

Yet here, the FCC elected to interpret the Seventh COVID-19 Waiver Order—in contradiction of its plain language and the public's interest that had justified the waivers in the first place—to deny reimbursement for all Lifeline subscribers who did not use their services during April 2021, despite the continued public health risks associated with the pandemic and the explicit waiver of the non-usage requirement during that month.

The FCC's predetermined, atextual interpretation of its order is exactly the type of regulatory bait-and-switch that Courts do not tolerate and that do not further the public interest. *See, e.g., Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them."). By ignoring the plain language of its own Order to justify denying one month of Lifeline reimbursements to Petitioners (but apparently not others), the FCC acted contrary to the public interest, and its Order should be vacated as arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition, vacate the FCC's December 3 Order, and remand to the agency with instructions to reimburse Petitioners for their upward revised April 2021 claims.

May 13, 2026                    Respectfully submitted,

                                s/ Miles E. Coleman
                                   Miles E. Coleman, Esq.
                                   Abigail Wood McCoy, Esq.
                                   Nelson Mullins Riley & Scarborough, LLP
                                   2 W. Washington Street, Ste 400
                                   Greenville, SC 29601
                                   (864) 373-2245
                                   miles.coleman@nelsonmullins.com
                                   abigail.mccoy@nelsonmullins.com

                                *Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I certify that on May 13, 2026, I caused the foregoing to be served upon all counsel of record via the Clerk of Court's CM/ECF notification system.

Dated: May 13, 2026                    <u>s/ Miles E. Coleman</u>
                                               Miles E. Coleman, Esq.

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 10,691 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Century Schoolbook font.

Dated: May 13, 2026                     s/ Miles E. Coleman
                                         Miles E. Coleman, Esq.