No. 26-60057

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

ASSIST WIRELESS, LLC, BOOMERANG WIRELESS, LLC D/B/A ENTOUCH
WIRELESS, EASY TELEPHONE SERVICES COMPANY D/B/A EASY WIRELESS,
I-WIRELESS LLC D/B/A ACCESS WIRELESS,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents,*

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

Dina Kallay
  *Deputy Assistant
    Attorney General*

Robert B. Nicholson
Avi Grunfeld
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

D. Adam Candeub
  *General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

William J. Scher
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## STATEMENT REGARDING ORAL ARGUMENT

Respondents believe that oral argument could be helpful in deciding this case.

# CERTIFICATE OF INTERESTED PERSONS

Under Fifth Circuit Rule 28.2.1, Respondents, as governmental parties, need not furnish a certificate of interested persons.

Dated: June 26, 2026      */s/ William J. Scher*

                                             William J. Scher
Counsel for Respondent Federal Communications Commission

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................vi

STATEMENT OF THE ISSUE ............................................................ 1

STATEMENT OF THE CASE ............................................................. 5

    A.    The Lifeline Program ............................................................ 5

        1.    Origins And Operation Of The Program ...................... 5

        2.    Reforms To Prevent Waste .............................................. 7

        3.    The COVID-19 Waiver Orders ...................................... 9

    B.    Petitioners' Payment Requests For April 2021 And The Initial Administrative Denials ............................................. 12

    C.    The *Order* On Review ....................................................... 14

STANDARD OF REVIEW ................................................................ 18

SUMMARY OF THE ARGUMENT ................................................... 18

ARGUMENT .................................................................................... 20

    THE COMMISSION CORRECTLY INTERPRETED THE *SEVENTH WAIVER ORDER* TO FORECLOSE PETITIONERS' PAYMENT REQUESTS .................................... 20

    A.    The Text Of The *Seventh Waiver Order* Compels The Commission's Interpretation ............................................. 21

        1.    The Waiver Period Ended On April 30, 2021, When Providers Had To Send Cure Notices ............... 21

        2.    Petitioners' Contrary "Plain Language" Arguments Are Unavailing ......................................... 22

    B.    Regulatory Context, History, And Purpose Reinforce The Commission's Reading ............................................... 27

        1.    The Broader Framework Of The Lifeline Rules ......... 27

        2.    FCC Rules Governing Computation Of Time ............. 31

        3.    History Of The COVID-19 Waivers ........................... 32

        4.    Regulatory Purpose To Guard Against Waste ........... 34

CONCLUSION ...................................................................... 38

CERTIFICATE OF COMPLIANCE ...................................... 39

# TABLE OF AUTHORITIES*

**Cases**

*Alenco Commc'ns, Inc. v. FCC,*
  201 F.3d 608 (5th Cir. 2000)...............................................................36

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992)...............................................................24, 34

*FCC v. Consumers' Research,*
  606 U.S. 656 (2025)...............................................................5

*Hill v. FCC,*
  496 F. App'x 396 (5th Cir. 2012)........................................................29

*Kisor v. Wilkie,*
  588 U.S. 558 (2019)..............................................18, 24, 27, 34

*Michigan v. Bay Mills Indian Cmty.,*
  572 U.S. 782 (2014)...............................................................24

*Nat'l Lifeline Ass'n v. FCC,*
  983 F.3d 498 (D.C. Cir. 2020)...............................................6, 7, 8, 9

*Roberts v. Sea-Land Servs., Inc.,*
  566 U.S. 93 (2012)...............................................................21, 25

*Ross v. Blake,*
  578 U.S. 632 (2016)...............................................................29

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1943)...............................................................18

*Texas Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n,*
  989 F.3d 368 (5th Cir. 2021)...............................................................18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*TNT Crane & Rigging, Inc. v. Occupational Safety & Health Rev. Comm'n,*
74 F.4th 347 (5th Cir. 2023) ........................................................ 18, 27

*United States v. M.H. Pulaski Co.,*
243 U.S. 97 (1917) .......................................................................... 24

## Statutes

5 U.S.C. § 706(2)(A) ........................................................................ 18

47 U.S.C. § 214(e)(2) .......................................................................... 6

47 U.S.C. § 214(e)(6) .......................................................................... 6

47 U.S.C. § 405(a) ..................................................................... 29, 37

## Regulations

47 C.F.R. § 1.4(c) ...................................................................... 16, 32

47 C.F.R. § 1.4(d) ..................................................................... 16, 32

47 C.F.R. § 1.106(b)(1) ................................................................... 29

47 C.F.R. § 54.405(e)(3) ........................................................... *passim*

47 C.F.R. § 54.407(a) ..................................................................... 1, 8

47 C.F.R. § 54.407(c)(2) ........................................................... *passim*

47 C.F.R. § 54.719(b) ...................................................................... 13

## Administrative Materials

*Lifeline and Link Up Reform,*
40 FCC Rcd 9602 (2025) ........................................................ *passim*

*Lifeline and Link Up Reform,*
   27 FCC Rcd 6656 (2012) ........................................................ 6, 7, 35

*Lifeline and Link Up Reform,*
   31 FCC Rcd 3962 (2016) .......................................................... *passim*

*Lifeline and Link Up Reform,*
   34 FCC Rcd 10886 (2019) ........................................................ *passim*

*Lifeline and Link Up Reform,*
   35 FCC Rcd 12954 (Wireline Comp. Bur. 2020) ................................ 10

*Lifeline and Link Up Reform,*
   35 FCC Rcd 2950 (Wireline Comp. Bur. 2020) ............................... 9, 10

*Lifeline and Link Up Reform,*
   35 FCC Rcd 4482 (Wireline Comp. Bur. 2020) ............................. 10, 33

*Lifeline and Link Up Reform,*
   35 FCC Rcd 5510 (Wireline Comp. Bur. 2020) ................................ 10

*Lifeline and Link Up Reform,*
   35 FCC Rcd 8791 (Wireline Comp. Bur. 2020) ............................. 10, 33

*Lifeline and Link Up Reform,*
   36 FCC Rcd 4448 (Wireline Comp. Bur. 2021) .......................... *passim*

*Lifeline and Link Up Reform,*
   39 FCC Rcd 8795 (Wireline Comp. Bur. 2024) ................................ 13

*Wireline Competition Bureau Provides Guidance on the Lifeline
   Reimbursement Payment Process,*
   33 FCC Rcd 128 (Wireline Comp. Bur. 2018) .................................... 9

**Treatise**

Antonin Scalia & Bryan A. Garner, READING LAW: THE
INTERPRETATION OF LEGAL TEXTS (2012) .............................................31

## STATEMENT OF THE ISSUE

This case concerns the Federal Communications Commission's oversight of its "Lifeline" universal service program during the COVID-19 pandemic.

Lifeline subsidizes voice and broadband data connectivity for low-income consumers through monthly payments to their service providers. It is funded by contributions from telecommunications carriers to the FCC's Universal Service Fund, the cost of which is ultimately borne by all telecommunications consumers. To prevent waste of these funds, the Commission has rules to ensure that providers receive payments only for Lifeline customers who actually use the service.

Under the "snapshot rule," 47 C.F.R. § 54.407(a), the monthly reimbursement amount that providers receive for offering Lifeline service is tied to the "number of actual qualifying low-income customers" that each provider serves as of a fixed "snapshot" date: the first day of the next month. For example, a provider's Lifeline payments for June depend on the number of qualifying customers it has on July 1.

Two additional rules called the "notice" and "usage" rules, 47 C.F.R. §§ 54.405(e)(3), 54.407(c)(2), apply when providers—like petitioners here—offer "prepaid" (that is, free-to-the-customer) Lifeline services.

These rules are designed to ensure that providers receive support only for subscribers who actually use the subsidized services.

Under the notice rule, "if a [prepaid] Lifeline subscriber fails to use" Lifeline service "for 30 consecutive days," the subscriber's carrier "must provide the subscriber … notice ... that ... failure to use the Lifeline service within [a subsequent] 15-day notice period will result in service termination for non-usage." 47 C.F.R. § 54.405(e)(3).

Under the usage rule, a provider may receive payments only for "subscribers who have used the service within the last 30 days" as of the snapshot date, "or who have cured their non-usage as provided for in [the notice rule]." 47 C.F.R. § 54.407(c)(2).

During the COVID-19 pandemic, the Commission issued a series of orders in which it waived the notice and usage rules for successive two- or three-month intervals.

This case arises from the seventh waiver order. *Lifeline and Link Up Reform*, 36 FCC Rcd 4448 (Wireline Comp. Bur. 2021) (JA __-__) (*Seventh Waiver Order*). In the preface to the *Seventh Waiver Order*, the Commission explained that, although it was extending waivers of several Lifeline rules by four months, it "decline[d] to further extend the existing

waiver of the [notice and usage rules]" for an equivalent period. *Id.* ¶ 1 (JA __). In the operative paragraphs, the agency extended the notice and usage rule waiver for only two months. *See id.* ¶¶ 9-10 (JA __-__). Specifically, the FCC required providers "to send cure notices to subscribers who, as of May 1, 2021, ha[d] not used their service in the previous 30-days"—that is, between April 1 and April 30, 2021. *Id.* ¶ 10 (JA __). In doing so, the agency recognized that providers would need adequate time to send out an anticipated large volume of notices, but also that a longer extension would not fulfill its duty to prevent waste of Lifeline funding when the record showed that payments were increasingly "being used to support ... service that no one [was] using." *Id.* ¶ 9 (JA __). Finally, the FCC reminded providers of its commitment to preventing waste of program funds. *Id.* ¶ 11 (JA __).

In the order on review, *Lifeline and Link Up Reform*, 40 FCC Rcd 9602 (2025) (JA __-__) (*Order*), the Commission denied petitioners' requests to receive roughly $1.6 million in Lifeline funds for April 2021 attributable to subscribers who neither used prepaid Lifeline services during that month nor subsequently cured their non-usage. Petitioners based these requests on a theory that the *Seventh Waiver Order* extended

the COVID-19 waiver of the notice and usage rules through the snapshot date of May 1, 2021. *See id.* ¶¶ 4, 6 (JA __, __). But petitioners' reading divorced the individual words and phrases on which they relied from the *Seventh Waiver Order* as a whole, and from the broader regulatory context, history, and purpose of the waiver and the underlying rules. Taking appropriate account of these factors, the Commission rejected petitioners' reading, interpreting the *Seventh Waiver Order* instead to have closed the waiver period on April 30.

The question presented is whether to uphold the Commission's interpretation of the *Seventh Waiver Order* as the correct reading. The answer is yes, and the petition for review should therefore be denied.

**PERTINENT STATUTES AND REGULATIONS**

Pertinent statutes and regulations are set forth in the statutory addendum bound with this brief.

**STATEMENT OF THE CASE**

**A.    The Lifeline Program**

**1.    Origins And Operation Of The Program**

Congress has directed the Commission to "'make available, so far as possible, to all the people of the United States,' reliable communications services 'at reasonable charges'"—a "goal now called universal service." *FCC v. Consumers' Research*, 606 U.S. 656, 664 (2025) (quoting 47 U.S.C. § 151). Thus, all carriers providing interstate telecommunications services must contribute to what is "known as the Universal Service Fund, to pay for subsidy programs for designated populations and facilities needing improved access." *Id.* at 666. "The ... Lifeline program aiding low-income individuals," which supports access to voice and/or broadband service, is one of these universal service programs. *Id.*

Lifeline service may only be provided by eligible telecommunications carriers, or "ETCs," which are certified by state public utility commissions or designated by the Commission. 47 U.S.C.

§ 214(e)(2), (6). "Many ETCs ... use a standard fee-for-service model, in which subscribers pay the ETC a recurring, discounted monthly fee in exchange for [Lifeline] service." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 502 (D.C. Cir. 2020) (*National Lifeline*). Under this model, the Lifeline program reimburses the carrier for the monthly service discounts provided to eligible subscribers.

"Since 2005," however, "a number of pre-paid wireless providers have become Lifeline-only ETCs, competing for low-income subscribers by marketing telephone service that provides a specified number of minutes at no charge to the consumer." *Lifeline and Link Up Reform*, 27 FCC Rcd 6656, 6668 (¶ 23) (2012) (JA __) (*2012 Lifeline Order*). These ETCs have increased Lifeline enrollments and expanded choices for low-income consumers in many states. *Id.*

But "[a]s this growth in Lifeline occurred, so did waste, fraud, and abuse in the program," *National Lifeline*, 983 F.3d at 503, in part due to the manner in which Lifeline-only ETCs provide service. "For prepaid plans, ... Lifeline subscribers are not required to make recurring payments to their ETC; instead, the ETCs receive the Lifeline support payments on behalf of such subscribers." *Id.* at 504. "Thus, for prepaid plans, ETCs have no regular billing arrangement with—and, sometimes,

little ongoing contact with—their Lifeline subscribers." *Id.* As a result, "there is a significant risk of 'phantom accounts' for which the subscriber is not receiving the benefit of the supported service." *Id.* (internal quotation marks omitted).

This situation has sometimes enabled ETCs to receive funding for customers who have discontinued, or never used, their Lifeline services. *2012 Lifeline Order* ¶ 257 (JA __). That "wastes Lifeline support, because the program is not actually benefiting the consumer for which it is intended." *Id.* ¶ 255 (JA __).

### 2. Reforms To Prevent Waste

Accordingly, the Commission has engaged in reforming its rules to prevent waste of Lifeline funding without undermining the goals of the program.

As relevant here, the Commission adopted a "usage" requirement to ensure that ETCs receive Lifeline support only for qualified low-income customers who actually use the service. 47 C.F.R. § 54.407(c)(2). *See 2012 Lifeline Order* ¶¶ 255-263 (JA __-__). Under the FCC's usage rule, prepaid-plan ETCs are eligible to receive support payments only for Lifeline service provided to subscribers who have used the service within

the last 30 days, or who subsequently "cure" their non-usage. 47 C.F.R. § 54.407(c)(2). *See id.* (defining activities that may "establish 'usage'").

Under the notice rule, if a prepaid "Lifeline subscriber fails to use" the service "for 30 consecutive days," an ETC must "provide the subscriber 15 days' notice ... that the subscriber's failure to use the Lifeline service within the 15-day notice period will result in service termination for non-usage." 47 C.F.R. § 54.405(e)(3). This 15-day period is known as the "cure period." "Lifeline service providers must notify subscribers of possible termination on the 30th day [of non-usage] and terminate service if, during the subsequent 15 days, the subscriber has not used the service." *Lifeline and Link Up Reform*, 31 FCC Rcd 3962, 4115 (¶ 415) (2016) (JA __) (*2016 Lifeline Order*).

Finally, the "snapshot rule" "requires an ETC to take a 'snapshot' of its Lifeline subscribers as of the first of the month in order to file requests for reimbursements attributable to those subscribers." *National Lifeline*, 983 F.3d at 505. *See* 47 C.F.R. § 54.407(a); *Wireline Competition Bureau Provides Guidance on the Lifeline Reimbursement Payment Process*, 33 FCC Rcd 128, 128 (Wireline Comp. Bur. 2018) ("The snapshot

report, which is taken on the first of the month, will show the ETC's subscriber count for the prior month.").[1]

Prepaid subscribers who are in the 15-day cure period on the snapshot date are included in the ETCs' subscriber counts, but ETCs cannot claim reimbursement for them. *National Lifeline*, 983 F.3d at 510; 47 C.F.R. § 54.407(c)(2). ETCs may later request payment for any such customers who cure their non-usage within 15 days. *See id.*

### 3. The COVID-19 Waiver Orders

Early in the COVID-19 pandemic, the FCC recognized the heightened "importance of connectivity for all Americans." *Lifeline and Link Up Reform*, 35 FCC Rcd 2950, 2952 (¶ 8) (Wireline Comp. Bur. 2020) (JA __). On March 30, 2020, seeking to "ensure that no Lifeline subscribers [would be] involuntarily de-enrolled from the Lifeline program during this unprecedented national" emergency, the Commission's Wireline Competition Bureau (Bureau) waived the notice and usage rules, as well as a number of other Lifeline rules, for a period of 60 days. *Id.* ¶¶ 2, 7 (JA __, __). In doing so, the Bureau found that

---

[1] Payment requests are filed with the Universal Service Administrative Company (USAC), which administers the Commission's universal service programs.

"allowing Lifeline subscribers to continue to receive service even if they have not used that service in the past 45 days" would serve the public interest by ensuring that subscribers would "continue to have access to a ready connection to communications service should the need arise." *Id.* ¶ 8 (JA __).

Over the course of the next year, the Bureau issued a series of orders extending its Lifeline rule waivers (including the notice and usage rules) for additional two- or three-month intervals: through the end of June, August, and November 2020, and then through February 28, 2021. *See Lifeline and Link Up Reform*, 35 FCC Rcd 12954, 12955 (¶ 3) (Wireline Comp. Bur. 2020) (JA __); *Lifeline and Link Up Reform*, 35 FCC Rcd 8791, 8792 (¶ 4) (Wireline Comp. Bur. 2020) (JA __) (*Fifth Waiver Order*); *Lifeline and Link Up Reform*, 35 FCC Rcd 5510, 5514 (¶ 12) (Wireline Comp. Bur. 2020) (JA __); *Lifeline and Link Up Reform*, 35 FCC Rcd 4482, 4484 (¶ 8) (Wireline Comp. Bur. 2020) (JA __) (*Third Waiver Order*).

On February 24, 2021, the Bureau issued the *Seventh Waiver Order*, extending the COVID-19 waivers for the last time. In an introductory paragraph, the Bureau stated generally that, while it would extend for four more months the waiver of several rules not at issue in

our case, it would not extend the notice and usage rule waiver beyond May 1, 2021. *Seventh Waiver Order* ¶ 1 (JA __). Then, in operative paragraphs 9 and 10, the Bureau "decline[d] to extend the previous waiver of the Commission's non-usage rule"—that is, the notice and usage rules[2] —"by four months." *Id.* ¶ 9 (JA __). These two rules, it explained, had been waived for almost a year—thus increasing the likelihood that Lifeline program money was being spent for services not actually used. *Id.*

"Therefore," the Bureau explained, it would "extend the waiver" for a more limited time and "require ETCs to send cure notices to subscribers who, as of May 1, 2021, [had] not used their service in the previous 30-days." *Seventh Waiver Order* ¶ 10 (JA __). Thus, the *Seventh Waiver Order* obligated providers to send cure notices to prepaid subscribers who had not used Lifeline services during the month of April 2021. The Bureau granted this last, additional two-month waiver of the notice and usage rules "[r]ecognizing that," because the rules had been waived for

---

[2] The Bureau in the *Seventh Waiver Order* referred to 47 C.F.R. §§ 54.405(e)(3) and 54.407(c)(2) collectively as the "non-usage rule" or the "Lifeline usage requirement." *Seventh Waiver Order* ¶¶ 1, 9 & n.15 (JA __, __). For clarity in this brief, we refer to the rules individually.

the past year, "ETCs [might] be responsible for sending a larger number of non-usage notices" than would otherwise be usual, and they would need sufficient time to meet this renewed obligation. *Id.*

## B. Petitioners' Payment Requests For April 2021 And The Initial Administrative Denials

As petitioners acknowledge (Br. 12), when they initially submitted "reimbursement claims for services provided in April 2021" after "the May 1, 2021 snapshot," they did not "seek reimbursement for Lifeline subscribers who on that snapshot date had not used their services in the past 30 days." On April 19, 2021, USAC had circulated guidance to ETCs that, under the *Seventh Waiver Order*, "subscribers who, as of May 1, 2021 [had] not used their service in the previous 30 days [would] enter their 15-day cure period on May 1." *See* Assist Wireless, LLC – Application For Review, WC Docket No. 11-42 at 5 & Exh. D (Sept. 6, 2024)) (JA __, __) (Application for Review). Petitioners evidently considered it "clear that USAC's interpretation was endorsed by [at least] certain FCC staff members." *Id.* at 5 n.24 (JA __).

In April 2022, however, petitioners (and two other ETCs) "submitted upward revisions to their April 2021 reimbursement claims." *Order* ¶ 4 (JA __). These revised payment requests included subscribers

who, petitioners newly asserted, "were in the final day of their permitted non-usage period on May 1, 2021, and thus were properly included in [petitioners'] April 2021 claims even though the subscribers did not cure their non-usage during a subsequent cure period." *Id.*

Petitioners tell the Court (Br. 12-13), as they told USAC, the Bureau, and the Commission, that they submitted these upward revisions after "learn[ing] that other ETCs had sought and received reimbursement for such Lifeline users for April 2021." But they have never offered any specific factual allegations or evidence to support that such payments occurred. *See Order* ¶ 11 (JA __).

USAC denied petitioners' April 2022 upward revisions and subsequent appeals. *Id.* Petitioners then sought review from the FCC.[3] On August 8, 2024, the Bureau issued an order agreeing with USAC. *See generally Lifeline and Link Up Reform*, 39 FCC Rcd 8795 (Wireline Comp. Bur. 2024). Petitioners then applied for review by the full Commission. *See generally* Application for Review (JA __-__).

---

[3] Any party aggrieved by an action of USAC, after seeking review from USAC, may then seek review from the Commission. 47 C.F.R. § 54.719(b).

## C. The *Order* On Review

The Commission agreed with the Bureau and USAC that the *Seventh Waiver Order* does not entitle petitioners to payments for customers who neither used their prepaid Lifeline services during April 2021 nor cured their non-usage during the subsequent 15-day cure period. *Order* ¶¶ 1, 6 (JA __-__, __).

Central to the Commission's analysis was the text of paragraph 10 of the *Seventh Waiver Order*, which, as discussed above, "extend[ed] the waiver and require[d] ETCs to send cure notices to subscribers who, as of May 1, 2021, [had] not used their service in the previous 30-days." *Order* ¶ 7 (JA __) (quoting *Seventh Waiver Order* ¶ 10 (JA __)). "The 'previous 30-days' before May 1, 2021," the FCC reasoned, "[we]re April 1 through April 30." *Id.* And the FCC regarded "no other statements in [the *Seventh Waiver Order* to] contradict this interpretation that the end of the waiver was to be on the last day of the month of April 2021." *Id.*

In particular, the Commission explained that the "statement in the first paragraph" of the *Seventh Waiver Order*—where the Bureau "*decline[d]* to further extend the existing waiver ... beyond May 1, 2021"—does not contradict the statement in paragraph 10 that subscribers "who, as of May 1, 2021, [had] not used their service in the

previous 30-days," would enter the cure period on the May 1 snapshot date. *Order* ¶ 8 (JA\_\_\_) (quoting with emphasis *Seventh Waiver Order* ¶ 1 (JA \_\_)). The "negative statement" in paragraph 1 "about what the Bureau was *not* doing," the FCC reasoned, "does not conflict with the clear and affirmative statement" in paragraph 10 "of what the Bureau *was* doing." *Id.*

The Commission also rejected petitioners' argument that the waiver must have extended through May 1 "because they 'could not send a cure notice on April 30 when the subscriber had at least through the end of the day on April 30 ... to use the service to avoid the need for a cure notice.'" *Order* ¶ 9 (JA \_\_). The *Seventh Waiver Order*, the FCC recognized, was issued against the well-settled regulatory backdrop that "ETCs must notify subscribers of possible de-enrollment '*on* the 30th day' of non-usage." *Id.* ¶ 9 & n.41 (JA\_\_\_) (quoting *2016 Lifeline Order* ¶ 415 (JA \_\_) and *Lifeline and Link Up Reform*, 34 FCC Rcd 10886, 10936 (¶ 116) (2019) (JA \_\_) (*2019 Lifeline Order*)). "Nothing in the *Seventh ... Waiver Order* or the Commission's rules requires that ... ETCs give subscribers 'at least through the end of the day' on the 30th day of non-usage before sending cure notices." *Id.* ¶ 9 (JA\_\_) (quoting petitioners'

applications for review). *See id.* ("sending a cure *notice* on the 30th day of non-usage does not deprive subscribers of" the full 45-day period to establish usage under the rules).

The Commission further explained that its plain reading of the text of the *Seventh Waiver Order* was consistent with all of the following additional factors:

(1) the Bureau's prior COVID-19 waiver orders, which consistently extended Lifeline rule waivers through the end of a given month, meaning that the waiver periods ended on the last day of that month, *Order* ¶¶ 7, 8 n.39 (JA __, __);

(2) the broader framework of Lifeline regulations, which provide Lifeline customers with a total of 45 days to establish usage, not "the 46 or more" days petitioners sought (excluding the preceding waiver period), *id.* ¶ 7 (JA __); *see id.* ¶¶ 8 n.34, 9 (JA __-__);

(3) the FCC's general rules governing computation of time periods, *id.* ¶¶ 7, 10 (JA __, __) (discussing 47 C.F.R. § 1.4(c), (d)); and

(4) the Bureau's goal of minimizing waste of Lifeline funding by ending the waiver "promptly, given concerns that many subscribers were not actually using their Lifeline service." *Id.* ¶ 7 (JA __).

Finally, the Commission rejected petitioners' public-policy argument that their reading of the *Seventh Waiver Order* would better serve the public interest. *Order* ¶ 11 (JA __). Petitioners' reading, the FCC explained, "would extend access for a customer not using the service by only *one or two days longer* ... , while at the same time providing [petitioners] with a *full extra month* of reimbursements for services the Bureau was concerned were largely going unused." *Id.* n.59 (JA __) (emphasis in original). In the FCC's judgment, that result would not best serve "[t]he purpose of the usage [rule] waiver," which "was to ensure access to essential communications services for a temporary period during the COVID[-]19 pandemic," not "to ensure payments to ETCs for unused services." *Id.* ¶ 11 (JA __).[4]

---

[4] Before the Commission (but not in their brief here), petitioners argued that the agency should have credited their "unsupported allegations that unnamed ETCs received" payments "consistent with [petitioners'] preferred interpretation of the Seventh . . . Waiver Order." *Order* ¶ 11 (JA __). The FCC agreed with the Bureau that petitioners had not met their "burden of production" (or proof) on this point. *Id.* And in any event, the FCC explained, the agency "would enforce its interpretation of the Seventh . . . Waiver Order" if it knew of any such payments. *Id.* USAC is investigating whether some carriers received payments inconsistent with the agency's reading of the *Seventh Waiver Order*. Consistent with the *Order*, the Commission has directed USAC to seek to recover any such improper payments.

## STANDARD OF REVIEW

"In construing a regulation," courts "give effect to the natural and plain meaning of the regulation's words." *TNT Crane & Rigging, Inc. v. Occupational Safety & Health Rev. Comm'n*, 74 F.4th 347, 353 (5th Cir. 2023). Courts also "use 'all the traditional tools of construction,' *i.e.*, carefully consider the [regulation]'s 'text, structure, history, and purpose.'" *Id.* at 354 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019)). While the Commission in this case disclaims any deference of the sort that remains after *Kisor v. Wilkie*, it is entitled to respect for the persuasiveness of its reasoning. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1943).

Petitioners bear a heavy burden to establish that the *Order* is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard is highly deferential; [courts] apply a presumption of validity and may not substitute [their] judgment for that of the agency." *Texas Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).

## SUMMARY OF THE ARGUMENT

We agree with petitioners (Br. 2) that "[t]he issue before the Court is a straightforward question of textual interpretation." But the *Seventh*

*Waiver Order* was not written in a vacuum. In the *Order* on review, the Commission appropriately analyzed the plain language of the *Seventh Waiver Order* in the context of the order as a whole, and also took account of the order's broader regulatory context, history, and purpose. Applying this familiar approach to textual construction, there should be no doubt: the only reasonable reading of the *Seventh Waiver Order* is that the usage rule waiver expired on April 30, 2021.

**Plain text compels the Commission's interpretation.** The language extending the usage rule waiver is in paragraph 10 of the *Seventh Waiver Order*. There, the Bureau stated that subscribers were entitled to cure notices if, "as of May 1, 2021," they had "not used their service in the previous 30-days." *Seventh Waiver Order* ¶ 10 (JA __). The 30 days "previous" to May 1 were April 1 through April 30. "Therefore, the expiration of the waiver period [was] April 30." *Order* ¶ 7 (JA __).

No other statements in the *Seventh Waiver Order* contradict that view. In particular, the statement in paragraph 1 about a longer extension that the Bureau was *declining* to provide—consistent with a similar statement in paragraph 9—does not undermine the affirmative statement in paragraph 10.

- 19 -

**Other tools of construction reinforce the Commission's plain-text reading.** First, the Commission's reading is consistent with the broader framework of the Lifeline regulations, which require ETCs to send cure notices to customers who have not used the service "on the 30th day" of non-usage, and which give prepaid Lifeline subscribers "a total of 45 days . . . to demonstrate usage." *2016 Lifeline Order* ¶ 415 (JA __). The Commission's reading also is consistent with its general rules governing computation of time periods, *Order* ¶ 10 (JA __), and with the Bureau's prior waiver orders, which consistently extended waivers to the last day of the designated month. *Id.* ¶ 8 n.39 (JA __).

The Commission's reading also avoids waste of Lifeline funding by withholding April 2021 subsidy payments in connection with subscribers who neither used the service during that month nor subsequently cured their non-usage. In contrast, petitioners' reading would provide them a windfall—of roughly $1.6 million—without benefiting subscribers.

## ARGUMENT

### THE COMMISSION CORRECTLY INTERPRETED THE *SEVENTH WAIVER ORDER* TO FORECLOSE PETITIONERS' PAYMENT REQUESTS

The Commission correctly interpreted the plain text of the *Seventh Waiver Order* in the context of the order as a whole—as ordinary

principles of textual construction require. *E.g., Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). The broader regulatory context, history, and purpose of the *Seventh Waiver Order* and the Lifeline rules confirm the agency's textual interpretation.

**A.    The Text Of The *Seventh Waiver Order* Compels The Commission's Interpretation**

**1.    The Waiver Period Ended On April 30, 2021, When Providers Had To Send Cure Notices**

Under the Lifeline rules, ETCs "shall only continue to receive universal service support reimbursement for [prepaid] Lifeline service provided to subscribers who have used the service within the last 30 days, or who have cured their non-usage.'" 47 C.F.R. § 54.407(c)(2). Following the extended waiver of this requirement and the companion notice rule, *id.* § 54.405(e)(3), during the COVID-19 pandemic, the Bureau recognized that it was time to draw the waiver period to a close. It decided to "extend the waiver" past "the expiration of the current waiver period on February 28, 2021," but to "require ETCs to send cure notices to subscribers who, as of May 1, 2021, ha[d] not used their service in the previous 30-days." *Seventh Waiver Order* ¶¶ 9-10 (JA __-__).

As the Commission explained in the *Order* on review, the "'previous 30-days' before May 1, 2021[, we]re April 1 through April 30." *Order* ¶ 7

(JA __). And since 2016, the agency has consistently interpreted the notice rule, 47 C.F.R. § 54.405(e)(3), to require ETCs to send cure notices on the 30th day of non-usage, and to provide for a 15-day cure period that begins the next day. *See Order* ¶ 9 & n.41 (JA __) (citing *2016 Lifeline Order* ¶ 415 (JA __); *2019 Lifeline Order* ¶ 116 (JA __)).

By requiring ETCs to send notices "to subscribers who, as of May 1, 2021, ha[d] not used their service in the previous 30-days," the Bureau clearly specified that the cure period for those subscribers began on May 1. *Order* ¶ 7 (JA __). "Therefore, the expiration of the waiver period [was] April 30," and the usage rule waiver did not extend into the May 1, 2021, snapshot date. *Id.*

### 2. Petitioners' Contrary "Plain Language" Arguments Are Unavailing

**a**. Seeking to diminish the significance of paragraph 10, petitioners assert that "[t]he operative language" concerning the duration of the waiver "is found in the first paragraph of the [*Seventh Waiver Order*]." Br. 23. *See id.* at 23-27. There, the Bureau extended its COVID-19 waiver as to other Lifeline rules "through June 30, 2021," before next stating: "However, we decline to further extend the existing waiver of the Commission's Lifeline usage requirement beyond May 1, 2021." *Seventh*

*Waiver Order* ¶ 1 (JA __). Petitioners read that language to mean that "the waiver remained in effect *on* May 1, 2021[,] ... but [did] not extend past or *beyond* that day." Br. 23.

This heavy reliance on paragraph 1 and the ordinary meaning of the word "beyond"—out of context from the rest of the *Seventh Waiver Order*—is misplaced. To start, paragraph 1—which appears under the heading "Introduction," *Seventh Waiver Order* ¶ 1 (JA __)—is prefatory. It provides an overview but does not purport to detail decisions that are later fully addressed in the order's "Discussion" section. *See id.* ¶¶ 2-11 (JA __-__).

In addition, the language on which petitioners rely was a "negative statement" of what the Bureau was *declining* to do—grant the same, lengthier waiver it was granting for other Lifeline rules. *Order* ¶ 8 (JA __). *See also Seventh Waiver Order* ¶ 9 (JA __) ("We … decline to extend the previous waiver of the Commission's non-usage rule for the Lifeline program by four months"). It was not an "affirmative" statement that, on

its own, is reasonably construed to have granted an extended period of non-usage. *Order* ¶ 8 (JA __).[5]

The Commission's reading honors the basic principle that a statute or regulation must be interpreted to "mean[] what it says"—*i.e.*, that the Bureau was not granting the same lengthy waiver extension as for other Lifeline rules—"and no more." *United States v. M.H. Pulaski Co.*, 243 U.S. 97, 107 (1917). *Accord Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). *See Kisor*, 588 U.S. at 573-75 (courts interpret regulations with the same legal toolkit that they use for statutory interpretation). Petitioners' reading, in contrast, by focusing narrowly on the word "beyond" in a single sentence of paragraph 1, interprets the Bureau to "have intended something broader" than it actually stated in the text, even considering paragraph 1 in isolation. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (internal quotation marks omitted).

---

[5] Contrary to petitioners' assertion (Br. 16), this does not suggest that the statement in paragraph 1 "means nothing," only that it did not define when the usage rule waiver ended. Instead, the statement in paragraph 1 contrasted the Bureau's decision to extend other rule waivers through June with its decision not to do so for the usage rule—consistent, too, with paragraph 9 of the *Seventh Waiver Order*.

By considering paragraph 1 within the context of the *Seventh Waiver Order* as a whole, moreover—including the Bureau's reasoned explanation for its action in paragraphs 9 and 10—the Commission's reading also comports with the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts*, 566 U.S. at 101 (cleaned up). Under the circumstances, the Commission correctly found no "conflict" between paragraph 1 and the operative, affirmative language extending the usage rule waiver period in paragraph 10. *See Order* ¶ 8 (JA __-__).

**b.** Petitioners strain to offer a reading of paragraph 10 of the *Seventh Waiver Order* that comports with their view of paragraph 1. *See* Br. 27-32. *See also id.* at 38-40. In analyzing the language requiring "ETCs to send cure notices to subscribers who, as of May 1, 2021, [had] not used their service in the previous 30-days," *Seventh Waiver Order* ¶ 10 (JA __), petitioners focus on the words "as of" while largely ignoring the phrase "in the previous 30-days."

Focusing on "as of," petitioners argue that paragraph 10 required ETCs to "'send cure notices to the relevant subscribers on *May 1 at the*

*earliest*, not on April 30." Br. 27-28. *See id.* 33 (the *Seventh Waiver Order* "directed ETCs to 'send cure notices ... as of May 1, 2021'" (quoting *Seventh Waiver Order* ¶ 10 (JA __))). But the phrase "as of May 1, 2021," applies to "subscribers," not "cure notices." Put differently, the Bureau used "as of May 1, 2021" to identify which subscribers were entitled to notices ("subscribers who, as of May 1, 2021, [had] not used their service in the previous 30-days"), not to identify when the notices had to be sent.

In mistakenly focusing their arguments concerning paragraph 10 on the question of when notices needed to be sent, as opposed to when the waiver of the notice and usage rules expired, petitioners fail to grapple with the import of the Bureau's reference to "the previous 30-days." As explained in the *Order* (¶ 7 (JA __)), "as of" the May 1 snapshot date referenced in paragraph 10, the only possible meaning of "the previous 30-days" was April 1 through April 30. "[S]ubscribers who ... [had] not used their service" in that period, *Seventh Waiver Order* ¶ 10 (JA __), were entitled to cure notices. "Therefore," under the plain text of paragraph 10, "the expiration of the waiver period [was] April 30." *Order* ¶ 7 (JA __).

### B. Regulatory Context, History, And Purpose Reinforce The Commission's Reading

The Commission's reading of the *Seventh Waiver Order* is supported by other "'tools of construction,'" *TNT Crane & Rigging*, 74 F.4th at 354 (quoting *Kisor*, 588 U.S. at 559)—in particular (1) the broader framework of the Lifeline rules, (2) the agency's general rules governing computation of time periods, (3) the Bureau's prior COVID-19 waiver orders, and (4) the Bureau's purpose to prevent waste of Lifeline funding.

### 1. The Broader Framework Of The Lifeline Rules

**a**. ETCs must send cure notices to prepaid Lifeline customers who have not used the service "on the 30th day" of non-usage "and terminate service if, during the subsequent 15 days, the subscriber has not" justified continued enrollment by using the service. 47 C.F.R. § 54.405(e)(3). *See Order* ¶ 9 (JA __); *2019 Lifeline Order* ¶ 116 (JA __); *2016 Lifeline Order* ¶ 415 (JA __). These regulations give subscribers "a total of 45 days in which to demonstrate usage." *2016 Lifeline Order* ¶ 415 (JA __).

This framework is fully consistent with the Commission's interpretation of the *Seventh Waiver Order*. Under the agency's reading, prepaid Lifeline subscribers had 30 days to demonstrate usage (April 1

through April 30), plus 15 days to cure their non-usage (May 1 through May 15) after receiving cure notices on April 30. In contrast, petitioners' reading of the *Seventh Waiver Order* would provide a total of 46 days in which to cure their non-usage, on top of the extended waiver period that preceded April 2021. *Order* ¶ 10 n.47 (JA __).

The Commission reasonably rejected petitioners' argument that, because "an ETC can't know until the *conclusion* of the 30th day (*i.e.*, 11:59:59 p.m. of the 30th day) whether the subscriber has accumulated 30 consecutive non-usage days," the waiver must have extended through May 1, 2021. Br. 31. "Nothing in the *Seventh ... Waiver Order* or the Commission's rules requires that ... ETCs give subscribers 'at least through the end of the day' on the 30th day of non-usage before sending cure notices." *Order* ¶ 9 (JA __). On the contrary, FCC orders make clear that cure notices must be sent "on the 30th day." *2016 Lifeline Order* ¶ 415 (JA __); *2019 Lifeline Order* ¶ 116 (JA __).

**b.** Recognizing that their reading of the *Seventh Waiver Order* is inconsistent with the regulatory framework, petitioners argue (Br. 31-32) that the FCC's orders requiring cure notices to be sent on the 30th day of non-usage are inconsistent with the Lifeline notice rule. As a threshold

matter, this argument is barred by 47 U.S.C. § 405(a), which provides that filing a petition for reconsideration is a "condition precedent" to judicial review of an FCC order "where the party seeking such review … relies on questions of fact or law upon which the Commission … has been afforded no opportunity to pass." *See* 47 C.F.R. § 1.106(b)(1) (governing reconsideration petitions).

Here, the Commission had "no opportunity to pass" on petitioners' argument that the *2016* and *2019 Lifeline Orders* are inconsistent with the notice rule. On the contrary, before the agency, petitioners argued that the *Lifeline Orders* support their reading of the *Seventh Waiver Order*, and they quoted the text that they now challenge without suggesting any issue with it. *See* Application For Review, pp. 15-16 & n.57 (JA __); *Order* ¶ 8 n.34 (JA __). Petitioners' failure to satisfy section 405 thus "precludes [this Court's] review." *Hill v. FCC*, 496 F. App'x 396, 402 (5th Cir. 2012). *See also Ross v. Blake*, 578 U.S. 632, 639 (2016) ("mandatory exhaustion regimes[]" "foreclose judicial discretion").

In any event, the Commission's orders comport with the rule, which provides that, "if a Lifeline subscriber fails to use … for 30 consecutive days a [prepaid] Lifeline service … , an [ETC] must provide the subscriber

15 days' notice ... that the subscriber's failure to use the Lifeline service within the 15-day notice period will result in service termination for non-usage." 47 C.F.R. § 54.405(e)(3). Again, the rule does not "require[] that ... ETCs give subscribers '... through the end of the day' on the 30th day of non-usage before sending cure notices." *Order* ¶ 9 (JA __). As the Commission explained, "the notice merely informs the subscriber they have 15 more days to use their service." *Id.* "If the subscriber uses their service later on the same day the notice is sent (or any time in the next 15 days), the subscriber will avoid de-enrollment." *Id.* Thus, requiring cure notices on the 30th consecutive day of non-usage does not deprive subscribers of the full 30-day usage period.

Petitioners (Br. 30 & n.10) also emphasize that the notice rule does not specify when cure notices must be sent. But the *Lifeline Orders* resolve that ambiguity, specifying that cure notices must be sent "on the 30th day" of non-usage. *2016 Lifeline Order* ¶ 415 (JA __); *2019 Lifeline Order* ¶ 116 (JA __). The Commission's reading of the *Seventh Waiver Order*, consistent with the well-settled regulatory backdrop that notice must be provided "*on* the 30th day of non-usage," *Order* ¶ 9 & n.41 (JA__) (internal quotation marks omitted), is not undermined by

petitioners' late-breaking (and foreclosed) challenge of the *Lifeline Orders*.

Petitioners' argument (Br. 31) that "the older, generic rule found in the 2016 and 2019 Lifeline Orders must yield to the more recent, specific exception found in the [*Seventh Waiver Order*], which states the notices should be sent 'as of May 1,'" also is without merit. The general/specific canon only applies "when conflicting provisions simply cannot be reconciled—when the attribution of no possible meaning can eliminate the conflict." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 183 (2012). As set forth above, there is no conflict between the *Lifeline Orders* and the Commission's reading of the *Seventh Waiver Order*. *See supra* Argument A.2.

### 2.    FCC Rules Governing Computation Of Time

Although petitioners argued before the agency—and suggest in passing again here (Br. 29, 40)—that the Commission's rules governing computation of time support their view of the *Seventh Waiver Order*, the agency rightly disagreed. *Order* ¶ 10 (JA __). In fact, those rules support the FCC's reading.

Section 1.4(c) provides that "the first day to be counted when a period of time begins with the occurrence of an act, event or default is the day after the day on which the act, event or default occurs." 47 C.F.R. § 1.4(c). Consistent with that rule, the Commission explained, "ETCs were required to send non-usage cure notices on April 30"—the last day of the waiver period and, therefore, "the day on which the act, event, or default occur[r]ed" for subscribers who had not used their Lifeline service within the last 30 days. *Order* ¶ 10 (JA __). "[T]he 15-day non-usage cure period started the next day." *Id.*

In addition, section 1.4(d) provides that "when computing a period of time the last day of such period of time is included in the computation, and any action required must be taken on or before that day." 47 C.F.R. § 1.4(d). Consistent with that rule, under the Commission's reading of the *Seventh Waiver Order*, "both the ending of the waiver period *and* the sending of cure notices [we]re 'required actions' and they [] both [had to] be taken on the same day," that is, April 30. *Order* ¶ 10 (JA __).

### 3. History Of The COVID-19 Waivers

**a.** The Commission's reading of the *Seventh Waiver Order* also harmonizes it with the Bureau's prior orders extending the COVID-19

Lifeline rule waivers. In each of those prior orders, the extended waivers expired on the last day of the designated month. *Order* ¶ 8 n.39 (JA __). Thus, interpreting the *Seventh Waiver Order* to "[e]xtend[] the [] waiver through the first of the month (rather than the end of the month) would [make it] inconsistent with all of the other COVID-19 [] waivers[.]" *Id.* Petitioners proffer no explanation as to why the Bureau would have departed from its consistent practice—particularly when doing so would have provided a windfall for carriers without benefiting subscribers. *Id.* *See id.* ¶ 11 n.59 (JA __).

**b.** Petitioners argue (Br. 32-36) that the Bureau's "change in language" in the *Seventh Waiver Order* from prior COVID-19 waiver orders—that is, referring to the May 1, 2021, snapshot date in paragraphs 1 and 10, rather than to the last day of the preceding month—must "connote[] a change in meaning." But although the earlier waiver orders do all reference the last day of the relevant month, they are not entirely consistent in their verbiage—sometimes adopting an extension "until" the end of the month, *Third Waiver Order* ¶ 8 (JA __), and other times "through," *e.g.*, *Fifth Waiver Order* ¶ 4 (JA __).

In any event, "canons of construction are no more than rules of thumb," and the text is the "one, cardinal canon" a court must turn to "before all others." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). In context, as set forth above, *see supra* Argument A, the reference to May 1, 2021, in paragraph 10 makes clear that the waiver expired on April 30, the last day of the preceding month. To the extent that the Bureau's language in the *Seventh Waiver Order* differed from earlier orders, this merely reflects the different circumstances: the Bureau was extending the waiver of the Lifeline usage rule for the last time, in light of growing concerns regarding the waste of Lifeline funding, and so it also had to address the resumption of cure notices, making the snapshot date relevant where it had not been previously.

### 4. Regulatory Purpose To Guard Against Waste

**a.** Finally, the Commission's reading of the *Seventh Waiver Order* is consistent with the purpose of the order, and of the usage rule itself. *See Kisor*, 588 U.S. at 559 ("the traditional tools of construction" include a regulation's "purpose" (internal quotation marks omitted)).

The FCC established the usage rule to ensure that "service providers would only receive support for eligible low-income subscribers

who actually use the service." *2016 Order* ¶ 411 (JA __). *See 2012 Lifeline Order* ¶ 258 (JA __) (concluding that paying ETCs for Lifeline subscribers who are not using the service is wasteful). The Bureau's reinstatement of the rule after a prolonged waiver was animated by that same goal: it sought to "re-establish[] [the] usage rule[] promptly, given concerns that many subscribers were not actually using their Lifeline service as the waiver period lingered." *Order* ¶ 7 (JA __).

Of course, the Bureau aimed to resume the ordinary operation of the usage rule in an orderly way, to allow ETCs to prepare what it anticipated would be an unusually "large[] number of non-usage notices," given the long duration of the waiver to that point. *Seventh Waiver Order* ¶ 10 (JA __). But given the Bureau's overarching concern that Lifeline funding was being wasted on unused services, the Commission reasonably refused to read the language of the *Seventh Waiver Order* to extend the waiver period "by only one or two days in order to [grant providers] a whole extra month of reimbursement" for unused services. *Order* ¶ 6 (JA __). *See id.* ¶ 11 (JA __).

**b.** Petitioners fail to engage with the Commission's reasoning that its reading of the *Seventh Waiver Order* comports with underlying

regulatory goals—and serves the public interest—by preventing waste of Lifeline funds. They nowhere suggest, for example, why the Bureau would deliberately have chosen, by referencing "May 1" instead of "April 30," to extend access to Lifeline services for consumers by "only *one or two days longer* ... while at the same time providing [petitioners] with a *full extra month* of reimbursements" for services that subscribers did not use. *Order* n.59 (JA __). *See Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 621 (5th Cir. 2000) ("The purpose of universal service is to benefit the customer, not the carrier.").[6]

In arguing that the Commission's reading of the *Seventh Waiver Order* "violated the requirement that [the agency] act in the public interest" (Br. 47-50), Petitioners note (Br. 50) "the explicit waiver of the [usage rule] during [April 2021]." But the agency made a public interest determination that the waiver should end on April 30, 2021, *see Seventh Waiver Order* ¶ 10 (JA __), to avoid "further disbursements being used to support a service that no one is using," *id.* ¶ 9 (JA __). Under the

---

[6] Petitioners state that the FCC denied "reimbursements for discounted services already provided," Br. 20, but there is no dispute that they sought payment for subscribers who did not use Lifeline service in April 2021 or cure their non-usage in the next 15 days.

reinstated rule, as of May 1, 2021, ETCs once again may not collect reimbursement for subscribers who have not used the service in 30 days or cured their non-usage as provided for under the notice rule. *See* 47 C.F.R. § 54.407(c)(2).

Citing (Br. 50) "continued public health risks associated with the pandemic" in April 2021, petitioners imply that the Commission should have reached a different public interest determination. But before the agency, petitioners never challenged the Bureau's determination that the time had come to terminate the waiver. Any such argument is accordingly barred here. *See* 47 U.S.C. § 405(a). In any event, the assertion that public health risks from COVID-19 persisted in April 2021, even if true, does not change that the overall regulatory context, history, and purpose of the *Seventh Waiver Order* support the Commission's textual analysis that the waiver period ended on April 30, 2021. That is the only reasonable interpretation of the *Seventh Waiver Order*.

# CONCLUSION

The petition for review should be denied.

| | |
|---|---|
| Dated: June 26, 2026 | Respectfully submitted |
| /s/ *Robert B. Nicholson* | /s/ *William J. Scher* |
| Dina Kallay<br>    *Deputy Assistant*<br>        *Attorney General* | D. Adam Candeub<br>    *General Counsel* |
| Robert B. Nicholson<br>Avi Grunfeld<br>    *Attorneys* | Sarah E. Citrin<br>    *Deputy Associate General Counsel* |
| U.S. DEPARTMENT OF JUSTICE<br>ANTITRUST DIVISION<br>950 Pennsylvania Ave. NW<br>Washington, DC 20530<br>*Counsel for Respondent*<br>    *United States of America* | William J. Scher<br>    *Counsel* |
| | FEDERAL COMMUNICATIONS<br>    COMMISSION<br>45 L Street NE<br>Washington, DC 20554<br>(202) 418-1740<br>fcclitigation@fcc.gov |
| | *Counsel for Respondent Federal*<br>    *Communications Commission* |

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App.
    P. 32(a)(7)(B) because, excluding the parts of the document
    exempted by Fed. R. App. P. 32(f):

    ☒   this document contains <u>7,581</u> words, *or*

    ☐   this document uses a monospaced typeface and contains <u>    </u>
        lines of text.

2.  This document complies with the typeface requirements of Fed. R.
    App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
    32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced
        typeface using <u>Microsoft Word for Office 365</u> in <u>14-point
        Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced
        typeface using <u>    </u> with <u>    </u>.

<u>*/s/ William J. Scher*</u>
William J. Scher
*Counsel for Respondents*

**CERTIFICATE OF FILING AND SERVICE**

I, William J. Scher, hereby certify that on June 26, 2026, I filed the foregoing Brief for Respondent with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ William J. Scher*

William J. Scher
  *Counsel*

Federal Communications
Commission
Washington, D.C.  20554
(202) 418-1740

**STATUTORY ADDENDUM**

# Contents

5 U.S.C. § 706 ...................................................................................................2

47 U.S.C. § 151...................................................................................................2

47 U.S.C. § 214...................................................................................................3

47 U.S.C. § 405...................................................................................................4

47 C.F.R. § 1.4...................................................................................................6

47 C.F.R. § 1.106...................................................................................................7

47 C.F.R. § 54.405...................................................................................................8

47 C.F.R. § 54.407...................................................................................................9

47 C.F.R. § 54.719...................................................................................................10

# 5 U.S.C. § 706

## § 706 Scope of Review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

* * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

# 47 U.S.C. § 151

## § 151. Purposes of chapter;
## Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

# 47 U.S.C. § 214

## § 214. Extension of lines or discontinuance of service; certificate of public convenience and necessity

\* \* \*

**(e) Provision of universal service**

\* \* \*

**(2) Designation of eligible telecommunications carriers**

A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

\* \* \*

**(6) Common carriers not subject to State commission jurisdiction**

In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a

service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

**47 U.S.C. § 405**

## § 405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order

(a) After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from

complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided,* That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

# 47 C.F.R. § 1.4

## § 1.4 Computation of time.

\* \* \*

(c) General Rule—Computation of Beginning Date When Action is Initiated by Act, Event or Default. Commission procedures frequently require the computation of a period of time where the period begins with the occurrence of an act, event or default and terminates a specific number of days thereafter. Unless otherwise provided, the first day to be counted when a period of time begins with the occurrence of an act, event or default is the day after the day on which the act, event or default occurs.

Example 8: Commission Rule § 21.39(d) requires the filing of an application requesting consent to involuntary assignment or control of the permit or license within thirty days after the occurrence of the death or legal disability of the licensee or permittee. If a licensee passes away on Sunday, March 1, 1987, the first day to be counted pursuant to § 1.4(c) is the day after the act or event. Therefore, Monday, March 2, 1987, is the first day of the thirty day period specified in § 21.39(d).

(d) General Rule—Computation of Terminal Date. Unless otherwise provided, when computing a period of time the last day of such period of time is included in the computation, and any action required must be taken on or before that day.

Example 9: Paragraph 1.4(b)(1) of this section provides that "public notice" in a notice and comment rule making proceeding begins on the day of Federal Register publication. Paragraph 1.4(b) of this section provides that the first day to be counted in computing a terminal date is the "day after the day" on which public notice occurs. Therefore, if the commission allows or requires an action to be taken 20 days after public notice in the Federal Register, the first day to be counted is the day after the date of the Federal Register publication. Accordingly, if the Federal Register document is published on Thursday, July 23, 1987,

public notice is given on Thursday, July 23, and the first day to be counted in computing a 20 day period is Friday, July 24, 1987. The 20th day or terminal date upon which action must be taken is Wednesday, August 12, 1987.

## 47 C.F.R. § 1.106

**§ 1.106 Petitions for reconsideration in non-rulemaking proceedings.**

\* \* \*

(b)(1) Subject to the limitations set forth in paragraph (b)(2) of this section, any party to the proceeding, or any other person whose interests are adversely affected by any action taken by the Commission or by the designated authority, may file a petition requesting reconsideration of the action taken. If the petition is filed by a person who is not a party to the proceeding, it shall state with particularity the manner in which the person's interests are adversely affected by the action taken, and shall show good reason why it was not possible for him to participate in the earlier stages of the proceeding.

**47 C.F.R. § 54.405**

**§ 54.405 Carrier obligation to offer Lifeline.**

\* \* \*

(e) De-enrollment—

\* \* \*

(3) De-enrollment for non-usage. Notwithstanding paragraph (e)(1) of this section, if a Lifeline subscriber fails to use, as "usage" is defined in § 54.407(c)(2), for 30 consecutive days a Lifeline service that does not require the eligible telecommunications carrier to assess and collect a monthly fee from its subscribers, an eligible telecommunications carrier must provide the subscriber 15 days' notice, using clear, easily understood language, that the subscriber's failure to use the Lifeline service within the 15–day notice period will result in service termination for non-usage under this paragraph. Eligible telecommunications carriers shall report to the Commission annually the number of subscribers de-enrolled for non-usage under this paragraph. This de-enrollment information must be reported by month and must be submitted to the Commission at the time an eligible telecommunications carrier submits its annual certification report pursuant to § 54.416.

# 47 C.F.R. § 54.407

## § 54.407 Reimbursement for offering Lifeline.

(a) Universal Service support for providing Lifeline shall be provided directly to an eligible telecommunications carrier based on the number of actual qualifying low-income customers listed in the National Lifeline Accountability Database that the eligible telecommunications carrier serves directly as of the first of the month. Eligible telecommunications carriers operating in a state that has provided the Commission with an approved valid certification pursuant to § 54.404(a) must comply with that state administrator's process for determining the number of subscribers to be claimed for each month, and in those states Universal Service support for providing Lifeline shall be provided directly to the eligible telecommunications carrier based on that number of actual qualifying low-income customers, according to the state administrator or other state agency's process.

\* \* \*

(c) An eligible telecommunications carrier offering a Lifeline service that does not require the eligible telecommunications carrier to assess and collect a monthly fee from its subscribers:

\* \* \*

(2) After service activation, an eligible telecommunications carrier shall only continue to receive universal service support reimbursement for such Lifeline service provided to subscribers who have used the service within the last 30 days, or who have cured their non-usage as provided for in § 54.405(e)(3). Any of these activities, if undertaken by the subscriber, will establish "usage" of the Lifeline service:

(i) Completion of an outbound call or usage of data;

9

(ii) Purchase of minutes or data from the eligible telecommunications carrier to add to the subscriber's service plan;

(iii) Answering an incoming call from a party other than the eligible telecommunications carrier or the eligible telecommunications carrier's agent or representative;

(iv) Responding to direct contact from the eligible communications carrier and confirming that he or she wants to continue receiving Lifeline service; or

(v) Sending a text message.

## 47 C.F.R. § 54.719

**§ 54.719 Parties permitted to seek review of Administrator decision.**

\* \* \*

(b) Any party aggrieved by an action taken by the Administrator, after seeking review from the Administrator, may then seek review from the Federal Communications Commission, as set forth in § 54.722.