No. 26-60057

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ASSIST WIRELESS, L.L.C.; BOOMERANG WIRELESS, L.L.C.,
D/B/A ENTOUCH WIRELESS; EASY TELEPHONE SERVICES COMPANY,
D/B/A EASY WIRELESS; and I-WIRELESS, L.L.C., D/B/A ACCESS WIRELESS,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION;
and the UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review from the
Federal Communications Commission

**REPLY BRIEF OF PETITIONERS ASSIST WIRELESS, L.L.C.;
BOOMERANG WIRELESS, L.L.C., D/B/A ENTOUCH WIRELESS;
EASY TELEPHONE SERVICES COMPANY, D/B/A EASY WIRELESS;
and I-WIRELESS, L.L.C., D/B/A ACCESS WIRELESS**

Miles E. Coleman, Esq.
Nelson Mullins Riley & Scarborough, LLP
2 W. Washington Street, Ste. 400
Greenville, SC 29601
(864) 373-2245
miles.coleman@nelsonmullins.com

*Counsel for Petitioners*

## CERTIFICATE OF INTERESTED PERSONS

No. 26-60057, *Assist Wireless, L.L.C., et al. v. Federal Communications Commission, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Petitioners: | Counsel for Petitioners: |
|---|---|
| Assist Wireless, L.L.C. | Miles Coleman of Nelson Mullins Riley & Scarborough, L.L.P., Greenville, SC |
| Boomerang Wireless, L.L.C. | |
| Easy Telephone Services Company | |
| i-wireless, L.L.C. | |

Pursuant to RULE 26.1(a), FED. R. APP. P., counsel certifies that the preceding parties are neither publicly-held corporations nor owned in whole or in part by publicly-held corporations with the exception of i-wireless LLC d/b/a Access Wireless, which is 50% owned by a publicly-held corporation, Kroger Co.

| Respondents: | Counsel for Respondents: |
|---|---|
| Federal Communications Commission | Jacob Lewis of Federal Communications Commission Washington, DC |
| | P. Ellison of Federal Communications Commission Washington, DC |
| | Sarah Citrin of Federal Communications Commission Washington, DC |
| | William Scher of Federal Communications Commission Washington, DC |
| | Igor Helman of Federal Communications Commission Washington, DC |
| | Todd Blanche, Acting U.S. Attorney General, U.S. Department of Justice Washington, DC |
| | Robert Nicholson of U.S. Department of Justice Washington, DC |
| United States of America | Jacob Lewis of Federal Communications Commission Washington, DC |
| | P. Ellison of Federal Communications Commission Washington, DC |
| | Sarah Citrin of Federal Communications Commission Washington, DC |
| | William Scher of Federal Communications Commission Washington, DC |
| | Igor Helman of Federal Communications Commission Washington, DC |
| | Todd Blanche, Acting U.S. Attorney General, U.S. Department of Justice Washington, DC |

| | Robert Nicholson of U.S. Department of Justice Washington, DC |
|---|---|

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|
| BBBY, Ltd. | These entities and individuals are not parties to this proceeding and are not represented by counsel in relation to this proceeding. |
| Flagship Equity LLC | |
| Genie Global | |
| HH Ventures, LLC | |
| Joseph Fernandez | |
| Jose Cortes, Jr. | |
| Kroger Co. | |
| SXCS Investments, LLC | |
| ViaOne Acquisition Company, LLC | |
| ViaOne Services, LLC | |

Counsel certifies that the parties listed above are not publicly-held corporations, with the exception of Kroger Co., which is a publicly-held corporation.

Dated: July 17, 2026.          s/ Miles E. Coleman
                                            Miles E. Coleman
                                            Attorney of Record for Petitioners

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................................... vi

TABLE OF AUTHORITIES .................................................................. vvi

INTRODUCTION .................................................................................... 1

ARGUMENT ......................................................................................... 3

I.   The FCC's textual arguments fail. ............................................. 3

    A.   Paragraph 1 of the Seventh Waiver Order has operative legal force—the FCC's "prefatory" and "negative statement" labels do not strip it of its effect. ....... 3

    B.   "[B]eyond May 1" means what it says: the waiver ran through and including May 1, 2021. ................................... 8

    C.   Paragraph 10, read in full, expressly extends the waiver through May 1 ................................................................ 10

    D.   The Seventh Waiver Order's departure from the prior waiver orders' language is presumptively meaningful. ..... 12

II.  Having failed on the text, the FCC retreats to regulatory context. That retreat fails too. ................................................. 14

    A.   The Seventh Waiver Order's "as of May 1" language displaces the generic "30th day" rule .............................. 16

    B.   Section 405(a) does not bar Petitioners' arguments .......... 20

    C.   Under the FCC's own time-computation rules, the operative date is May 1, 2021—not April 30 ..................... 23

III. The FCC's interpretation of the waiver period's end date is not persuasive even under *Skidmore* ........................................ 24

IV. The FCC's policy objections do not justify denying reimbursement for services made available during the waiver period...........................................................26

    A. The FCC's dim view, in hindsight, of its waiver policy doesn't free the FCC from complying with that policy........27

    B. Reimbursement for services made available during a lawful waiver period is not a "windfall."...........................29

CONCLUSION ...............................................................................31

CERTIFICATE OF SERVICE ...........................................................33

CERTIFICATE OF COMPLIANCE .....................................................34

**Page(s)**

**Cases**

***U.S. Supreme Court Cases***

*Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*,
305 U.S. 315 (1938) ........................................................18

*Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*,
331 U.S. 519 (1947) .......................................................4, 5

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........................................................15

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) .....................................................22, 22

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................24

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........................................................16

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ........................................................30

*Russello v. United States*,
464 U.S. 16 (1983) ..........................................................13

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1943) ....................................................24–26

***Other Federal Cases***

*Asadi v. G.E. Energy (USA), L.L.C.*,
720 F.3d 620 (5th Cir. 2013) ............................................9

*EchoStar Satellite L.L.C. v. FCC*,
704 F.3d 992 (D.C. Cir. 2013).......................................................22

*I.C.C. v. S. Ry. Co.*,
543 F.2d 534 (5th Cir. 1976) .......................................................16

*Neumann's Pharmacy, L.L.C. v. Drug Enf't Admin.*,
167 F.4th 320 (5th Cir. 2026).......................................................30

*Radar Solutions, Ltd. v. U.S. F.C.C.*,
628 F. Supp. 2d 714; 368 F. App'x 480 (W.D. Tex. 2009) ...............4

*Rest. L. Ctr. v. United States Dep't of Lab.*,
120 F.4th 163 (5th Cir. 2024).......................................................14

*Seago v. O'Malley*,
91 F.4th 386 (5th Cir. 2024)...................................................27–28

*Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368 (5th Cir. 2021) .........................................24

*Texas Off. of Pub. Util. Couns. v. FCC*,
183 F.3d 393 (5th Cir. 1999).......................................................21

*Time Warner Ent. Co., L.P. v. FCC*,
144 F.3d 75 (D.C. Cir. 1998) .......................................................21

*TNT Crane & Rigging, Inc. v. Occupational Safety & Health Rev. Comm'n*,
74 F.4th 347 (5th Cir. 2023).......................................................15

*United States v. Holy Land Found. for Relief & Dev.*,
722 F.3d 677 (5th Cir. 2013) .......................................................11

*United States v. Johnson*,
632 F.3d 912 (5th Cir. 2011) .........................................................4

*United States v. Tyler*, No. 23-30370,
2024 WL 4973306 (5th Cir. Dec. 4, 2024) .....................................21

*United States v. Wong Kim Bo*,
472 F.2d 720 (5th Cir. 1972) ................................................. 13, 13

*USAir, Inc. v. Dep't of Transp.*,
969 F.2d 1256 (D.C. Cir. 1992).................................................6

**Statutes**

31 U.S.C. § 1502 .........................................................................7

47 U.S.C. § 405 ....................................................................20–22

**Other Authorities**

47 C.F.R. § 54.405 .............................................................. 17, 30

47 C.F.R. § 54.407 ...................................................................18

*Bridging the Digital Divide for Low-Income Consumers
Lifeline & Link Up Reform & Modernization*, 34 FCC
Rcd. 10886, 2019 WL 6111347 (Nov. 14, 2019) ................ 16, 20–22

GAO, Principles of Federal Appropriations Law, Vol. I, ch. 5, at
5–6 (3d ed. 2004) ........................................................................7

*Lifeline & Link Up Reform & Modernization*,
40 FCC Rcd. 9602, 2025 WL 3765133 (Dec. 3, 2025) ....................*passim*

*Lifeline and Link Up Reform and Modernization*,
36 FCC Rcd. 4448, 2021 WL 763665 (Feb. 24, 2021)
("Seventh Waiver Order") ....................................................*passim*

*Lifeline & Link Up Reform & Modernization*,
35 FCC Rcd. 12954, 2020 WL 6779113 (Nov. 16, 2020)
("Sixth Waiver Order")............................................. 5, 6, 12, 18, 25

*Lifeline & Link Up Reform & Modernization,*
35 FCC Rcd. 8791, 2020 WL 4812502 (Aug. 17, 2020)
("Fifth Waiver Order").......................................................5, 12, 25

*Lifeline & Link Up Reform & Modernization,*
35 FCC Rcd. 5510, 2020 WL 2844870 (June 1, 2020)
("Fourth Waiver Order") ...................................................5, 12, 25

*Lifeline & Link Up Reform & Modernization,*
35 FCC Rcd. 4482, 2020 WL 2097288 (Apr. 29, 2020)
("Third Waiver Order") .....................................................5, 12, 25

*Lifeline & Link Up Reform & Modernization,*
35 FCC Rcd. 2950, 2020 WL 1536462 (Mar. 30, 2020)
("Second Waiver Order") ...................................................5, 18, 29

*Lifeline & Link Up Reform & Modernization,*
31 FCC Rcd. 3962, 2016 WL 1706939 (Apr. 27, 2016)......16, 20–22

Request for Review by Boomerang Wireless, LLC d/b/a enTouch
Wireless, WC Docket No. 11-42 (Jan. 17, 2024) ......................21, 22

## INTRODUCTION

The FCC has the same problem it's had all along: The Seventh COVID-19 Waiver Order ("Seventh Waiver Order") doesn't say what the FCC wishes it said. So, the FCC confronts that problem the same way it has all along—by pretending the waiver order says something else. The FCC's response brief, like the order on appeal, relies on bracketed alterations to quotations and relentless repetition as if insistence will make it so. But no amount of repetition or wishful thinking can alter the unambiguous text or its common sense, ordinary meaning.

The FCC argues the Court should ignore paragraph 1 of the Seventh Waiver Order because it is only a "prefatory," "negative statement." But neither the text's location in the document nor the fact that it's phrased as a final, outer limit can change its plain meaning or import. Next, the FCC argues that "broader regulatory context, history, and purpose" should override the plain text of the waiver order. But extratextual sources can't alter or overcome the plain meaning of an unambiguous text. The FCC also argues that Petitioners would receive a "windfall" if the FCC honored its word in the final waiver order. That's wrong. Petitioners provided a tangible benefit to their Lifeline

1

subscribers throughout April 2021: access to communications service during a national emergency. That is what the waiver orders intended and the Lifeline program is designed to reimburse. Last, the FCC tries to convert Paragraph 10's May 1 cure-notice trigger into an April 30 waiver end date. But that does not follow. Identifying subscribers who, "as of May 1, 2021," had not used service in the previous 30 days tells Eligible Telecommunications Carriers ("ETCs") who must receive cure notices; it does not rewrite Paragraph 1's express statement that the waiver would not extend "beyond May 1, 2021."

None of the FCC's arguments answer the two remaining questions before the Court:[1] (1) whether the FCC correctly interpreted the plain language of the Seventh Waiver Order, and, alternatively, (2) whether denying reimbursement for services Petitioners made available during the waiver period is consistent with the public interest. The answer to both is no.

---

[1] The third question presented in the Opening Brief—"[w]hether the FCC's interpretation of the Seventh Waiver Order should be afforded deference" (Br. xiii)—has already been answered. The FCC disclaims any *Kisor* deference for its interpretation of the Seventh Waiver Order. *See* Resp. 18.

The FCC's response reveals just how much damage the language in Paragraph 1 of the final waiver order does to its position. The critical phrase—"we decline to further extend the existing waiver of the [] Lifeline usage requirement beyond May 1, 2021"—doesn't appear in the FCC's brief until page 11, and even then, the FCC mostly paraphrases around it rather than quote and engage it. When an agency that needs to win a textual argument spends its brief avoiding the operative text, it's telling. Because the Seventh Waiver Order is not ambiguous (a point on which both parties agree) the Court's inquiry begins and ends with the text. The Court should reverse.

**ARGUMENT**

I. **The FCC's textual arguments fail.**

    A. **Paragraph 1 of the Seventh Waiver Order has operative legal force—the FCC's "prefatory" and "negative statement" labels do not strip it of its effect.**

The FCC argues that paragraph 1's statement "declin[ing] to further extend the existing waiver . . . beyond May 1, 2021" is effectively meaningless because (i) it's merely "prefatory" and (ii) it's just a "negative statement" about what the Bureau was declining to do, not an affirmative

3

statement defining when the waiver ended. *See* Resp. 2, 15, 22–24.[2] Neither survives scrutiny.

No principle of administrative law strips an order's introductory paragraph of its legal force simply because it appears under the heading "Introduction" rather than "Discussion." In fact, the opposite is true. The court in *Radar Solutions, Ltd. v. U.S. F.C.C.* rejected a similar placement-based argument that FCC order language was non-binding because it appeared in the body of the order rather than the official citation or ordering clauses. 628 F. Supp. 2d 714, 731 n.10 (W.D. Tex. 2009), *aff'd sub nom.* 368 F. App'x 480 (5th Cir. 2010) (explaining that the FCC's order language "further put Plaintiff on notice" and could be given effect despite its location). *Id.*

Here, paragraph 1's "beyond May 1, 2021" language cannot be erased because the FCC now prefers to treat later discussion-section language as controlling. That conclusion follows from the ordinary rule that headings cannot override text. *See Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.,* 331 U.S. 519, 529 (1947) ("the heading of a section cannot limit the plain meaning of the text"); *accord United States v.*

---

[2] Respondents are referred to in this brief collectively as the FCC.

4

*Johnson*, 632 F.3d 912, 924 (5th Cir. 2011) ("[H]eadings and titles are not meant to take the place of detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis.") (quoting *Bhd. of R.R. Trainmen*, 331 U.S. at 528).

The FCC's own conduct with the prior waiver orders exposes the hollowness of its "prefatory" theory. *See* Resp. 23. In the Second through Sixth Waiver Orders, the Bureau's Introduction and Discussion sections pointed to the same end date. The Second Waiver Order waived the usage and de-enrollment rules "until May 29, 2020" and directed ETCs to restart non-usage calculations "after the end of the waiver period on May 29, 2020." Second Waiver Order ¶¶ 2, 7, 12 (JA.251, 253-54). The Third Waiver Order extended the relevant waivers "until June 30, 2020," including in the Discussion section. Third Waiver Order ¶¶ 2, 6, 8, 10 (JA.247-49). The Fourth, Fifth, and Sixth Waiver Orders likewise extended the relevant waivers "through August 31, 2020," "through November 30, 2020," and "through February 28, 2021." *See* Fourth Waiver Order ¶¶ 2, 3, 9, 12, 14–15 (JA.240-41, 244-45); Fifth Waiver Order ¶¶ 2, 4, 7–9 (JA.236-38); Sixth Waiver Order ¶¶ 1, 3, 6–8 (JA.232-34). But the Seventh Waiver Order used different language. It did not

say the usage waiver ran "through April 30." It said the Bureau would not extend the waiver "beyond May 1, 2021." Seventh Waiver Order ¶ 1 (JA.188). And, as with the prior waiver orders, the relevant provisions can be read together: paragraph 1 establishes May 1 as the waiver's outer boundary, while paragraph 10 provides the cure-notice instruction tied to that same date. The "prefatory" label became necessary only because the FCC's reading of paragraph 10 conflicts with paragraph 1's plain statement—a conflict of the FCC's own making, and one with no counterpart in the Second through Sixth Waiver Orders. *See* Resp. 23.

The FCC can't have it both ways. It can't rely on Introduction-section language to establish legally binding waiver end dates across five consecutive waiver orders and then argue that Introduction-section language in the seventh is legally inert because it produces an inconvenient result.

The FCC's "negative statement" theory (Resp. 15, 23–24) fares no better. When someone says a time period *won't* last beyond a specific end point, everyone understands it *will* last until that end point. *See USAir, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1257, 1260 (D.C. Cir. 1992) (recognizing that an agency's statement that it "will not extend the

6

statutory deadline for a [final] decision beyond April 1, 1991" meant that April 1 was the operative deadline); *see also, e.g.*, 5th Cir. R. 11.2 (using "beyond the 30 day period" to describe a window that includes, but does not run after, the 30th day).

Or consider an analogy from federal appropriations law. Congress routinely provides that an "appropriation or fund is not available for expenditure for a period beyond the period otherwise authorized by law." 31 U.S.C. § 1502(a); *see also* GAO, Principles of Federal Appropriations Law, Vol. I, ch. 5, at 5–6 (3d ed. 2004) (calling it "an elementary principle" that budget authority "ceases to be available for incurring new obligations after the last day of the specified time period") (citation and marks omitted) (emphasis added). Nobody thinks the negatively phrased outer limit creates any uncertainty whether the funds are available before and through that final date. The same is true here. The Bureau stated both that "we extend the waiver" (paragraph 10) and that the extension would not last "beyond May 1, 2021" (paragraph 1). Like in the appropriations example, the negative phrasing of the outer limit doesn't leave the Court helpless to determine when the waiver ended. It remained in force through and including May 1, 2021.

The same is true in ordinary speech. If a parent tells a teenager, "You can't stay out past midnight," the teenager understands that he can go out, but he also understands the boundary: midnight is included, but the permission does not continue after midnight has passed. The parent need not state the limit in positive terms (e.g., "You must be home no later than midnight.") for the endpoint to be clear.

So too here: by "declin[ing] to further extend the existing waiver . . . beyond May 1, 2021" the Bureau identified May 1 as the final day of the waiver, not April 30. *See* Seventh Waiver Order ¶ 1 (JA.188).

## B. "[B]eyond May 1" means what it says: the waiver ran through and including May 1, 2021.

The word "beyond," used temporally, refers to a time after a stated date has passed. *See* Br. 24–25 (collecting dictionary definitions). So, the Bureau's statement that it was not extending the waiver "beyond May 1" means the waiver includes May 1 but does not continue after May 1 has passed. *See id.* The FCC does not meaningfully contest this ordinary meaning. Instead, its only response is that paragraph 1 must yield to paragraph 10. *See* Resp. 25–26. But paragraph 10 confirms, rather than contradicts, Petitioners' reading.

Paragraph 10 provides, in relevant part, that "we extend the waiver and require ETCs to send cure notices to subscribers who, as of May 1, 2021, have not used their service in the previous 30-days." Seventh Waiver Order ¶ 10 (JA.191). Paragraph 10 must be—and easily can be— read in harmony with paragraph 1. The Bureau was extending the waiver, and it tied the cure-notice requirement to the last day of the waiver period, May 1, meaning the cure period couldn't start until the next day, May 2, which was *after* the waiver had ended. *See* Br. 29–30, 39–40. Petitioners' reading harmonizes both paragraphs; the FCC's reading renders paragraph 1 meaningless.

The FCC repeatedly recites the Seventh Waiver Order's language— "beyond May 1, 2021" and "as of May 1, 2021"—and then, in the next breath, argues that this language means "April 30"—a date that is conspicuously absent from the Seventh Waiver Order. *See, e.g.*, Resp. 19, 21–26, 34. That's not a plain-language analysis. It's a *non sequitur*. The FCC concedes the Seventh Waiver Order is unambiguous. *See Lifeline & Link Up Reform & Modernization*, 40 FCC Rcd. 9602 ¶ 7, 2025 WL 3765133 (Dec. 3, 2025) ("Order"). Petitioners agree. So, the inquiry begins, and ends, with the text. *See Asadi v. G.E. Energy (USA), L.L.C.*,

720 F.3d 620, 622 (5th Cir. 2013) (where text is unambiguous, court's inquiry "begins and ends with the text").

"[B]eyond May 1" does not mean "before May 1." And "as of May 1" does not mean "as of April 30." The FCC's interpretation does not transform the text. *See* Br. 16 n.4.

### C. Paragraph 10, read in full, expressly extends the waiver through May 1.

The FCC contends that the requirement to send cure notices to subscribers who, "as of May 1, 2021," had "not used their service in the previous 30-days," refers to subscribers who hadn't used services from "April 1 through April 30." Resp. 19 (quoting Seventh Waiver Order ¶ 10 (JA.191)). So far, so good. But, from that premise, the FCC makes a startling leap of logic to conclude that "the expiration of the waiver period [was] April 30." *Id.* (quoting Order ¶ 7 (JA.4) (alteration in FCC's Response)).

Paragraph 10 does not define when the waiver ends—paragraph 1 does. Paragraph 1 is the definitional provision: it is the only place in the Seventh Waiver Order that sets the waiver's temporal outer boundary, stating that the Bureau "decline[d] to further extend the existing waiver . . . beyond May 1, 2021." Seventh Waiver Order ¶ 1 (JA.188).

Paragraph 10, in contrast, is an instructive provision: it tells ETCs when to send cure notices and which subscribers are entitled to cure notices. *Id.* ¶ 10 (JA.191). But paragraph 10's instruction cannot rewrite paragraph 1's definition of when the waiver ends, nor does it need to, because the two are easily harmonized. *See* Br. 38–40; *see also, e.g.*, *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 688 (5th Cir. 2013) (holding that "[t]he presence of the 'notwithstanding' clause does not alter [the Court's] responsibility to abide by the definitions provided by Congress in the same statute"). The FCC's position violates that principle: it invokes paragraph 10's instructions in an attempt to rewrite paragraph 1's unambiguous boundary—inserting "April 30" where the Seventh Waiver Order says "May 1."

The FCC also argues that the phrase "as of May 1, 2021" grammatically modifies "subscribers," rather than establishing when cure notices must be sent. *See* Resp. 26 (quoting Seventh Waiver Order ¶ 10 (JA.191) ("[W]e extend the waiver and require ETCs to send cure notices to subscribers who, as of May 1, 2021, have not used their service in the previous 30-days.")). That argument makes no difference and, therefore, fails. Determining who is a non-user "as of May 1" requires

11

that May 1 has arrived, meaning April 30 has ended completely. *See* Br. 17–18, 27–28, 39–40. The analysis can't take place, and the cure notices can't be sent, until May 1 at the earliest. Any other interpretation defies credulity. The FCC's interpretation neither makes sense nor can alter the plain language and meaning of the Seventh Waiver Order. *See* Resp. 31–32. That reading cannot stand.

**D.      The Seventh Waiver Order's departure from the prior waiver orders' language is presumptively meaningful.**

The FCC's reliance on the prior waiver orders' language fares no better. It argues that the Seventh Waiver Order should be read to expire at month-end because the prior waiver orders did. *See* Resp. 20. The problem with the FCC's argument is that the prior orders reached a different result *because they used different language*. The prior waiver orders expressly stated that they ended on the last day of the month. *See* Br. 10, 35 (quoting Third Waiver Order ¶ 2 (JA.247) ("until June 30, 2020"); Fourth Waiver Order ¶ 2 (JA.240) ("through August 31"); Fifth Waiver Order ¶ 2 (JA.236) ("through November 30"); Sixth Waiver Order ¶ 1 (JA.232) ("through February 28")). But the Seventh Waiver Order expressly departed from that practice, using "beyond May 1, 2021"—

referencing the first day of the following month—rather than "through April 30." Seventh Waiver Order ¶ 1 (JA.188).

Courts presume that difference is meaningful. *See Russello v. United States*, 464 U.S. 16, 23 (1983) (declining to "ascribe this difference to a simple mistake in draftsmanship"); *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) ("words in statutes should not be discarded as 'meaningless' and 'surplusage' . . . particularly where the words are excluded in other sections of the same act").

The FCC responds that the change in language merely "reflect[ed] the different circumstances" because the Bureau had to address the resumption of cure notices and so referenced the snapshot date. Resp. 34. That explanation doesn't hold up. If the waiver was meant to end on April 30, the Bureau could have said "through April 30"—as it had done in every prior order. Instead, it said "beyond May 1," a phrase never previously used.

Paragraph 9's structure confirms why: the Bureau was declining the requested *four*-month extension, choosing instead to extend the waiver by a shorter period—that does not support the FCC's post hoc wish that the waiver period ended on April 30, 2021. *See* Br. 39 (quoting

Seventh Waiver Order ¶ 9 (JA.191)). The Seventh Waiver Order's architecture is thus: (i) establish May 1 as the last day of the waiver (paragraph 1), (ii) decline the four-month extension (paragraph 9), and (iii) require cure notices to be sent starting on May 1, which is consistent with May 1 being the final date of the waiver (paragraph 10). All three operative provisions—paragraphs 1, 9, and 10—point to the same end date. *See* Br. 38–40. The FCC's failure to explain why the Bureau would depart from its settled formulation, if not to achieve a different result, leaves its interpretation unpersuasive. *See* Resp. 34.

## II. Having failed on the text, the FCC retreats to regulatory context. That retreat fails too.

The FCC's heavy reliance on the "broader regulatory context, history, and purpose" of the waiver is a concession that the FCC cannot prevail on the text. *See* Resp. 27–28. The FCC's brief structure confirms this: it spends the first ten pages avoiding the operative phrase—"beyond May 1, 2021"—and buries it on page eleven only to paraphrase around it. An agency that believed its textual position was strong would lead with the text, not retreat from it. The text is where the inquiry should start and end. *See Rest. L. Ctr. v. United States Dep't of Lab.*, 120 F.4th 163, 174 (5th Cir. 2024) ("[W]hile longstanding agency practice might have

the power to persuade, it has never had the power to control. Nor can [the Court] permit agency practice to defeat a statute's text . . . .") (citations and marks omitted); *see also Bostock v. Clayton County*, 590 U.S. 644, 653 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law.").

The authority the FCC cites doesn't permit extratextual sources to override the plain language of an unambiguous regulation. *See* Resp. 27 (citing *TNT Crane & Rigging, Inc. v. Occupational Safety & Health Rev. Comm'n*, 74 F.4th 347, 354 (5th Cir. 2023)). To the contrary, that case applies the familiar principle that courts begin with the text and resort to broader contextual considerations *only to resolve genuine uncertainty* in the regulatory language itself. *See, e.g.*, *TNT*, 74 F.4th at 353 (courts "give effect to the natural and plain meaning of the regulation's words," and the agency's interpretation is relevant only "[w]hen the regulation is silent or genuinely ambiguous") (citation and marks omitted).

That case, therefore, reinforces, rather than undermines, Petitioners' position that the Seventh Waiver Order should be interpreted according to its plain text. The FCC's appeal to the Lifeline

program's pre-pandemic cure-notice practice, to the format of prior waiver orders, and to its anti-waste purpose, *see* Resp. 27–35, cannot rescue an interpretation that contradicts the Seventh Waiver Order's text.

### A. The Seventh Waiver Order's "as of May 1" language displaces the generic "30th day" rule.

The FCC contends that its settled practice—requiring cure notices be sent "on the 30th day" of non-usage under the *2016* and *2019 Lifeline Orders*—confirms that notices were due April 30 and the waiver therefore ended on that day. Resp. 27–30. Its premise is flawed. "[T]he specific governs the general," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992), and "the subsequent enactment governs" the earlier, *I.C.C. v. S. Ry. Co.*, 543 F.2d 534, 539 (5th Cir. 1976).

The Seventh Waiver Order's "as of May 1, 2021" language, as the more recent and more specific authority governing the waiver period, controls over the general background rule in the *2016* and *2019 Lifeline Orders*. *See* Br. 16–17 (citing Order ¶ 9 (JA.5-6) (noting that the FCC previously acknowledged, but did not heed, the interpretive rule that the older, generic rule should govern only "in the absence of a more specific rule")).

While the FCC argues there is "no conflict" between the *2016* and *2019 Lifeline Orders* and the FCC's interpretation, *see* Resp. 31, the Seventh Waiver Order's "as of May 1" language undeniably conflicts with the general "30th day" rule by specifying a different date for the cure notices to be sent (i.e., "at the expiration of the waiver period" and not before) based on non-usage "in the *previous* 30-days." Seventh Waiver Order ¶ 10 (JA.191) (emphasis added). The FCC's interpretation requires ETCs to have sent cure notices on the 30th day of non-usage (i.e., April 30). That interpretation cannot be reconciled with the Seventh Waiver Order's instruction to send notices "at the expiration of the waiver period" (i.e., "as of May 1") to subscribers who "have not used their service in the previous 30 days." *Id.* (JA.191). There is no way to square the FCC's "on the 30th day" position, *see* Resp. 30, with the text of the Seventh Waiver Order, which expressly sets forth a different sequence.

The FCC also contends that Petitioners' reading would give subscribers 46 days of cure opportunity—30 days of waiver plus a 16-day cure period starting May 2—thereby violating the 45-day framework. *See* Resp. 28. That argument fails for three reasons. *See* Br. 3–8, 29–31.

*First,* the 45-day framework is the normal, default, non-pandemic framework. It is the baseline, not the exception. The 45-day total derives from the ordinary, un-waived interplay of 47 C.F.R. §§ 54.405(e)(3) and 54.407(c)(2). Yet those are the very rules the Bureau waived here. It is internally contradictory to invoke the default framework to cabin the scope of the waiver of that framework. The prior waiver orders suspended the ordinary 30- plus 15-day structure for nearly a year: from March 30, 2020 through February 28, 2021. *See* Second Waiver Order ¶ 2 (JA.251); Sixth Waiver Order ¶ 1 (JA.232). Petitioners' subscribers were not ordinary subscribers in an ordinary month. They had been shielded from de-enrollment since late March 2020. *See* Second Waiver Order ¶ 2 (JA.251) (waiving usage and de-enrollment rules to "help ensure that no Lifeline subscribers are involuntarily de-enrolled from the Lifeline program during this unprecedented national pandemic"). Measuring their transition against the default calendar makes no sense when the default calendar was precisely what was waived. *See Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938) ("constru[ing] statutes so as to avoid results glaringly absurd, has long been a judicial function"). The FCC cannot use the very framework it

suspended to manufacture a one-day limit the waiver order did not impose.

*Second,* the one additional day granted by requiring 15-day cure notices to be sent on May 1 based on non-usage during the *previous* 30 days does not defeat the FCC's anti-waste rationale, while denying a full month of reimbursement would prejudice Petitioners. The Bureau acknowledged that ETCs might need extra time to handle an unusually large volume of cure notices given the extended waiver period. Seventh Waiver Order ¶ 10 (JA.191). Providing ETCs one additional day to identify and notify non-users as of May 1 reflects that rationale. That modest timing accommodation harms no one. But denying Petitioners approximately $1.6 million in reimbursement for discounted Lifeline services made available during a waiver period the FCC itself put in place is a significant deprivation. *See* Resp. 3, 20.

*Third,* the FCC's own framing undercuts itself. The FCC acknowledges the practical difference between the two readings is "only one or two days longer" for subscribers. Resp. 33, 36 (citing Order ¶ 11 n.59 (JA.8)). If the difference in subscriber access is so trivial as to be not worth mentioning, it cannot simultaneously be the basis for a principled

45-day framework defense that cannot be reconciled with the text of the Seventh Waiver Order. The FCC can't have it both ways. It can't argue the extra day is insignificant to subscribers while treating it as a sufficient reason to deny Petitioners a full month of reimbursement for April 2021 services already rendered pursuant to and consistent with the public interest purpose of the Seventh Waiver Order. *See Armstrong*, 305 U.S. at 333.

The FCC's position depends on treating the suspended 45-day framework as both waived and controlling—a contradiction that cannot justify converting a modest one-day transition into a forfeiture of an entire month's reimbursement for services that Petitioners provided under the waiver regime the FCC itself created.

## B. Section 405(a) does not bar Petitioners' arguments.

The FCC contends that Petitioners' arguments—(i) that the *2016* and *2019 Lifeline Orders* are inconsistent with the notice rule, and (ii) that the FCC's interpretation of the Seventh Waiver Order contradicted the public's interest, *see* Br. 20, 31–32, 47–50—are barred by 47 U.S.C. § 405(a) and not preserved for review. *See* Resp. 28–29, 37. Neither contention holds.

Section 405(a) bars appellate review only where the Commission has been "afforded no opportunity to pass" on the underlying "questions of fact or law." 47 U.S.C. § 405(a). But this Court has already held that Section 405(a) does not require every argument supporting the preserved question to be made to the Commission in precisely the same form. "So long as the issue is necessarily implicated by the argument made to the Commission, section 405 does not bar [this Court's] review." *Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 434 n.71 (5th Cir. 1999) (quoting *Time Warner Ent. Co., L.P. v. FCC*, 144 F.3d 75, 80 (D.C. Cir. 1998)). Petitioners raised the *2016* and *2019 Lifeline Orders* and the cure period below. *See, e.g.*, Request for Review by Boomerang Wireless, LLC d/b/a enTouch Wireless, WC Docket No. 11-42 at ii, 3, 8–13 (Jan. 17, 2024) (JA.201, 207, 212-17) ("Request for Review").

Petitioners' arguments on appeal are not identical to those below— but they did not need to be. The Fifth Circuit has made clear that an objection below and an argument on appeal "need not be identical" to preserve the point, *United States v. Tyler*, No. 23-30370, 2024 WL 4973306, at *3 (5th Cir. Dec. 4, 2024), and the Supreme Court has likewise confirmed that parties "are not limited to the precise arguments

21

they made below," *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (citation omitted). Once the claim is preserved, a party may "make any argument in support of [that] claim." *Id.* This Court can consider an argument—even if previously "expressly disavowed" (which is not the case here)—if it is "fairly embraced within the question set forth." *Id.* at 378–80. Petitioners' arguments were at least "fairly embraced within the question set forth," and that is enough.

As for the public's interest, Petitioners addressed that argument at length. *See* Request for Review at ii–iii, 8, 13–14 (JA.200-201, 212, 217-18). Again, the arguments on appeal are fairly embraced in the claims below. That is enough.

Petitioners' arguments are preserved by another, independent, reason, too. "[T]he FCC's independent contemplation of the issue satisfies § 405's mandate." *EchoStar Satellite L.L.C. v. FCC*, 704 F.3d 992, 996 (D.C. Cir. 2013); *see also, e.g.*, *Lebron*, 513 U.S. at 379 ("even if this were a claim not raised by petitioner below, we would ordinarily feel free to address it, since it was addressed by the court below"). The Order expressly and repeatedly cites the *2016* and *2019 Lifeline Orders* and discusses the timing of cure notices. *See* Order ¶¶ 2 n.14, 6 n.25, 8 n.34,

9 nn.41 & 44, 10 nn.47 & 50, 11 n.55 (JA.2-7). And the Seventh Waiver Order cites the *2019 Lifeline Order* too. *See* Seventh Waiver Order ¶¶ 3 n.5, 5 n.10 (JA.189-90). As for the public interest argument, the Seventh Waiver Order discussed it, *id.* ¶ 2 (JA.188). So did the Order. Order ¶ 11 (JA.7). That is enough for this Court to consider the arguments here.

**C. Under the FCC's own time-computation rules, the operative date is May 1, 2021—not April 30.**

The FCC suggests that "both the ending of the waiver period and the sending of cure notices" had to be on April 30. Resp. 32 (quoting Order ¶ 10 (JA.6)). The Seventh Waiver Order's own text forecloses that reading. Paragraph 10 expressly directs ETCs to send cure notices "at the expiration of the waiver period" and then identifies that date as May 1— not April 30. *See* Seventh Waiver Order ¶ 10 (JA.191). The FCC cannot invoke 47 C.F.R. § 1.4 to reach a different result when the Seventh Waiver Order speaks plainly. *See* Br. 5, 31–32 (quoting 47 C.F.R. § 1.4(c) ("the first day to be counted when a period of time begins with the occurrence of an act, event or default is the day after the day on which the act, event or default occurs")). Paragraph 10's identification of May 1 as the cure-notice date is also consistent with—and confirms—the plain

text of paragraph 1, which sets the final day of the waiver period as May 1. *See* Br. 39–40.

## III. The FCC's interpretation of the waiver period's end date is not persuasive even under *Skidmore*.[3]

The FCC suggests that it "is entitled to respect for the persuasiveness of its reasoning." Resp. 18 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1943)). *Skidmore* respect tracks (i) "the thoroughness evident in [the agency's] consideration," (ii) "the validity of its reasoning," and (iii) "its consistency with earlier and later pronouncements." *Skidmore*, 323 U.S. at 140. The FCC's reasoning fails on all three.

*Thoroughness: Skidmore* respect derives from an agency interpretation "based upon more specialized experience and broader investigations and information" than a court typically has. *Id.* at 139. The FCC has shown neither. Its central interpretive move was inserting "[i.e., April 30]" into a quotation from its Order—a date that appears nowhere

---

[3] The FCC's "highly deferential" standard and "presumption of validity" claims rest on a pre-*Loper* case. *See* Resp. 18 (citing *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021)). Under *Loper*, courts independently decide whether an agency acted within its statutory authority. 603 U.S. 369, 412 (2024). This "presumption" cannot help the FCC evade independent judicial review.

in that Order. *See* Order ¶ 9 (JA.5-6). If the FCC's "thoroughness" consists of inserting a dispositive date into a quotation of its own order—a date the Seventh Waiver Order never used—and then repeating that insertion as a conclusion, it has not shown the kind of considered judgment *Skidmore* contemplates.

*Validity:* The FCC has not shown the "validity of its reasoning." *Skidmore*, 323 U.S. at 140. Its reasoning is circular: it inserted "April 30" because it concluded the waiver ended then—and concluded the waiver ended then because of its own insertion. *Skidmore* does not require courts to defer to an agency that substitutes an assertion for analysis. *See id.* at 139–40. Because the FCC has shown neither "thoroughness evident in its consideration" nor "the validity of its reasoning," its interpretation warrants no *Skidmore* weight. *Id.* at 140.

*Consistency:* The FCC likewise has not shown "consistency with earlier and later pronouncements." *Id.* In the waiver orders that preceded the Seventh Waiver Order, when the FCC intended to extend the waiver only through the final day of a month, it plainly said so. *See* Third Waiver Order ¶ 2 ("until June 30, 2020") (JA.247); Fourth Waiver Order ¶ 2 ("through August 31, 2020") (JA.240); Fifth Waiver Order ¶ 2 ("through

November 30, 2020") (JA.236); Sixth Waiver Order ¶ 1 ("through February 28, 2021") (JA.232). If, as the FCC now claims, it meant for the seventh waiver to last only until April 30, 2021, the consistent and clear practice would have been to say the waiver was extended "through April 30, 2021." But that's not what the FCC did. It plainly diverged from its past wording and its past practice, and it cannot now claim that in *this* inconsistent instance, the Court should defer to its prior, different, practice.

The FCC's interpretation thus lacks the thoroughness, reasoned validity, and consistency that give an agency view persuasive force under *Skidmore*. The same textual problem defeats Respondents' policy objections, which cannot rewrite the waiver period the Seventh Waiver Order established.

## IV. The FCC's policy objections do not justify denying reimbursement for services made available during the waiver period.

Petitioners already explained that the FCC's denial of April 2021 reimbursements was contrary to the public interest, which presents an independent, alternative basis for reversal. *See* Br. xiii, 47–50. The FCC

makes one argument in response, then raises a policy argument of its own. Neither is persuasive.

### A. The FCC's dim view, in hindsight, of its waiver policy doesn't free the FCC from complying with that policy.

The FCC argues that Petitioners' plain-language reading wouldn't be good policy. *See* Resp. 35–36. But that's not the question before the Court. The Court's task is to interpret the Seventh Waiver Order as written. *See Seago v. O'Malley*, 91 F.4th 386, 390 (5th Cir. 2024) ("[W]e enforce the statute's plain meaning, unless absurd.") (citation and marks omitted). And there is nothing problematic about Petitioners' interpretation: the plain-language reading produces the policy outcome the FCC had applied without objection for more than a year, across six consecutive waiver orders. If covering non-users during a waiver period is bad policy, that critique should be aimed at the FCC's own prior course of conduct—not Petitioners' reliance on the last order in that series.

The FCC's policy critique rests on a supposed asymmetry. According to the FCC, it wouldn't make sense "to extend access to Lifeline services for consumers by 'only *one or two days longer* … while at the same time providing [petitioners] with a *full extra month* of reimbursements[.]"

Resp. 36 (emphases, alterations, and ellipses in FCC's Response) (citation omitted). But that argument is triply wrong.

*First*, it's irrelevant. As noted above, the question before the Court isn't whether the FCC struck the optimal balance. It's what the plain language of the Seventh Waiver Order means. *Seago*, 91 F.4th at 390.

*Second*, it's insincere. Assume the FCC is right and the plain-language meaning of the final waiver order is suboptimal. The blame for that lies not with Petitioners' interpretation but with the FCC, which wrote the text and established that outcome. The FCC's apparently dim view, in hindsight, of its decision isn't an excuse for the FCC to renege.

*Third*, it's incorrect. The supposed asymmetry of which the FCC complains—that "only one or two days" of service earned "a full extra month of reimbursements," Resp. 36—is not imbalanced. The ETCs didn't get a month's pay for a day's work. By making May 1 the final day of the waiver, the Seventh Waiver Order allowed ETCs to seek a month's reimbursement for an entire month in which they already had made services available (April 2021). The imbalance, if any, runs the opposite way. Consistent with the Seventh Waiver Order, Petitioners made services available for 31 days (all of April plus May 1) and only sought

28

reimbursement for 30 of them, while the FCC seeks to deny reimbursement for any of them.

The FCC's professed policy disagreement with Petitioners' plain language interpretation is no reason to diverge from the ordinary, common-usage meaning of the text.

### B. Reimbursement for services made available during the waiver period is not a "windfall."

Reimbursing ETCs for services made available during a waiver the FCC itself created is not a "windfall." *Contra* Resp. 20, 33. It is how the Lifeline program operates. The FCC's contrary characterization—that Petitioners seek payment for services "not actually us[ed]," Resp. 20, 33, 35, 36 n.6—misunderstands the program it administers and the very purpose of the waivers it issued. The FCC's own waiver orders stated their public interest purpose: "ensuring that subscribers would 'continue to *have access* to a ready connection to communications service should the need arise.'" Resp. 10 (quoting Second Waiver Order ¶ 8 (JA.253) (emphasis added)). The Bureau made a public interest determination that access mattered more than usage during the pandemic, and it applied that determination without objection for nearly a year. Petitioners seek reimbursement for services they "provided"—made

available—to their Lifeline subscribers throughout April 2021. *See* Br. 12, 20, 47–50. That is the operative standard under the Lifeline program: ETCs are reimbursed for the discounted service they "[m]ake available" to qualifying subscribers, *see* 47 C.F.R. § 54.405(a), not just for services that a subscriber personally used on any given day.

The FCC admits that the usage waiver was, at minimum, in force throughout the entire month of April 2021. *See* Order ¶ 3 (JA.2-3) ("the order extended the waiver for a short period *through April 30, 2021*") (emphasis added). It cannot use a policy preference for its preferred end date—April 30—to override the Seventh Waiver Order's unambiguous text that establishes a different end date—May 1—which fairly results in ETCs being reimbursed for services provided during April 2021 when the usage requirement was waived. *See Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) (the government must "turn square corners" when it deals with regulated parties); *Neumann's Pharmacy, L.L.C. v. Drug Enf't Admin.*, 167 F.4th 320, 335 (5th Cir. 2026) ("even the most urgent regulatory goals do not permit an agency to depart from the regulations it has adopted while claiming to enforce them"). Thus, reimbursing ETCs for services they made available during a period during which the 30-day

usage requirement was waived is not a windfall; it is how the Lifeline program operates and no other outcome can be squared with the text of the Seventh Waiver Order.

Because Petitioners provided service to Lifeline subscribers during a period for which the 30-day non-usage rule was waived, denying reimbursement based on an interpretation that requires inserting unwritten dates into the Order's text is the kind of arbitrary agency action the APA forbids. *See* Br. 36–37 (to make its finding, the Order had to add the date "April 30" in brackets to its quote from the Seventh Waiver Order). Calling that reimbursement a "windfall" only repackages the FCC's rewritten end date as a policy objection, which is not a lawful basis for denying payment.

## CONCLUSION

The FCC wrote "beyond May 1, 2021." It should be held to what it wrote. This Court should grant the petition, vacate the Order, and remand to the agency with instructions to reimburse Petitioners for their upward revised April 2021 claims.

*[Signature on the following page.]*

31

Dated: July 17, 2026.      Respectfully submitted,

s/ Miles E. Coleman
Miles E. Coleman, Esq.
Nelson Mullins Riley & Scarborough, LLP
2 W. Washington Street, Ste. 400
Greenville, SC 29601
(864) 373-2245
miles.coleman@nelsonmullins.com

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I certify that on July 17, 2026, I caused the foregoing to be served upon all counsel of record via the Clerk of Court's CM/ECF notification system.

Dated: July 17, 2026.          s/ Miles E. Coleman

                                            Miles E. Coleman, Esq.

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 6,441 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Century Schoolbook font.

Dated: July 17, 2026.　　　　　　　s/ Miles E. Coleman
　　　　　　　　　　　　　　　　　Miles E. Coleman, Esq.